Steven **GAROFOLO,**
Petitioner-Appellant,

v.

Philip **COOMB,** Superintendent, Eastern New York Correctional Facility, Respondent-Appellee.

No. 57, Docket 86–2197.

United States Court of Appeals, Second Circuit.

Argued Sept. 16, 1986.

Decided Oct. 28, 1986.

Jeffrey A. Rabin, Brooklyn, N.Y., for petitioner-appellant.

Steven A. Hovani, Asst. Dist. Atty., Riverhead, N.Y. (Patrick Henry, Dist. Atty. of Suffolk County, Riverhead, N.Y., of counsel), for respondent-appellee.

Before LUMBARD, OAKES and MINER, Circuit Judges.

OAKES, Circuit Judge:

A state defendant seeking a grant of federal habeas corpus has at least four hurdles to get over to assert a viable claim. The first is that he must exhaust his available state remedies, *Picard v. Connor*, 404 U.S. 270, 275–76, 92 S.Ct. 509, 512, 30 L.Ed.2d 438 (1971), with the concomitant rule that he must exhaust his remedies as to *all* claims presented to the federal court, *Rose v. Lundy*, 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982). The second is that his federal claims must not have been defeated in the state courts due to his own procedural default unless he can show both "cause" for the default and resultant "prejudice." *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). The third hurdle is to establish that he does have a federal constitutional claim and is not merely asserting something that falls short of a constitutional right. *Moran v. Burbine*, —— U.S. ——, 106 S.Ct. 1135 89 L.Ed.2d 410 (1986). Finally, even establishing a constitutional right will avail him nothing if the constitutional error is one that can be considered harmless. *Rose v. Clark*, —— U.S. ——, 106 S.Ct. 3101 92 L.Ed.2d 460 (1986).

Appellant Steven Garofolo originally asserted five federal constitutional violations in support of his petition under 28 U.S.C. § 2254 (1982). Two of these he abandoned in accordance with the rule of *Rose v. Lundy*, as glossed by *Rock v. Coombe*, 694 F.2d 908 (2d Cir.1982), *cert. denied*, 460 U.S. 1083, 103 S.Ct. 1773, 76 L.Ed.2d 345 (1983) (petitioner may abandon unexhausted claims in order to obtain a federal court hearing on exhausted claims), and hence they need not concern us here. Although the United States District Court for the Eastern District of New York, Charles P.

Sifton, Judge, held that the other three claims had cleared the exhaustion hurdle, the court also found each claim without merit by reason of failure to clear one of the other hurdles in petitioner's path. Garofolo's appeal is now before us, the district court having issued a certificate of probable cause under 28 U.S.C. § 2253 (1982). We affirm the denial of Garofolo's petition for reasons that will be set forth below.

Garofolo was convicted on two counts of second degree murder—one, intentional murder, and the other, felony murder committed in the course of a rape. His victim was Catherine Wilkinson, whom he killed by strangling and beating with a nightstick. His conviction, though affirmed by the Appellate Division, 62 A.D.2d 1181, 403 N.Y.S.2d 608 (2d Dep't 1978), was reversed by the Court of Appeals, *People v. Garofolo*, 46 N.Y.2d 592, 415 N.Y.S.2d 810, 389 N.E.2d 123 (1979), on the ground that a written statement he gave to the police had been obtained in violation of his right to counsel. On retrial he was again convicted on both counts. This conviction was affirmed without opinion by the Appellate Division and Garofolo's request for leave to appeal to the Court of Appeals was denied. Appellant commenced a federal habeas proceeding in early 1983 but withdrew it in favor of an application to the Appellate Division for reargument of the appeal on state constitutional grounds enunciated in *People v. Bartolomeo*, 53 N.Y.2d 225, 440 N.Y.S.2d 894, 423 N.E.2d 371 (1981) (holding that under the state constitution it is a violation of a defendant's rights to interrogate him with knowledge that he is represented by counsel, albeit on a separate unrelated charge). This application was unsuccessful, as was a subsequent application for reconsideration, and the instant petition was reinstated.

## FACTS

Catherine Wilkinson's partially clad body was found in the woods of Suffolk County, New York, near Oak Beach Inn North several hours after her pocketbook had been found in a dumpster located at a gas station nearby. Shortly after Catherine's father reported her missing to the police he received a telephone call from a person identifying himself as Steven Garofolo. Mr. Wilkinson then turned the phone over to his wife, who received the same answer when she asked who was calling. At trial Mrs. Wilkinson testified that the caller indicated that he and Catherine had been dancing the night before, that she had asked him to call her for a date, and that he had seen her at several places, once with three "guys" by a white Rambler. Mrs. Wilkinson ascertained that the caller was at work and requested his phone number, which he gave her. She later gave the police Garofolo's name and number when they came to the Wilkinson home. Mrs. Wilkinson also testified that Catherine had shown her the pair of earrings Catherine was wearing before she had gone out the previous night. One of these earrings was found by the police two days later at a place indicated by Garofolo.

On October 26, 1975, the day after the murder, Garofolo told his employer, William Luciano, at Mario's Pizzeria in Massapequa, New York, that the night before he had had a fight with a bouncer at "Freckles" and that he thought he might have killed the bouncer. He also told Luciano that he had met a girl named Cathy whom he was going to drive home but that she got into an auto with three "guys" and he would not be surprised if she had likewise been killed. He also expressed concern as to whether fingerprints could be found on a human body. Later that day a Nassau County police officer talked with Garofolo at Mario's. Garofolo mentioned the probability that the Suffolk County police might contact him because the girl's mother had called him to find out whether he knew where she might be. According to Garofolo, the girl's mother had also told him that the girl had not returned home, although her purse had been found. Garofolo then told the officer that it was his opinion that she might have been murdered and it would not surprise him if she had been. He suggested that she was the type who

would "lead a guy on" sexually but then stop and go no further and that she had a reputation for disappearing. Garofolo also asked the officer whether fingerprints could be taken from a person's neck and was observed by the officer to be hanging a pair of wet blue denim dungarees in the bathroom.

That evening, two Suffolk homicide detectives arrived at Mario's and asked Garofolo if he was the Steven Garofolo who had called the Wilkinson home. When he said that he was, the detectives asked him to accompany them to the Suffolk police's homicide headquarters to view photographs in an attempt to identify the three "guys" he said he had seen Catherine Wilkinson with at Freckles. As they were leaving, another Nassau County police officer came in and ordered dinner. Garofolo asked him to watch his automobile parked out back. The officer who had talked to Garofolo earlier then returned to Mario's. The two Nassau County officers talked about the earlier conversation and together with William Luciano went into the bathroom of Mario's. There they saw the jeans and a pair of socks hanging on the bathroom window grate.

Meanwhile, at Suffolk police headquarters the detectives told Garofolo that Catherine Wilkinson's body had been found and that because of Garofolo's phone call they believed he was the last person to see her. He told them that he had seen Catherine buying drinks for three "guys" at Freckles and that he had tried to call her for a date. When the detectives noticed what looked to be new scratches on his face, he explained that he had gotten them in a fight a week before. The detectives then held a brief conference outside of Garofolo's presence, one detective voicing his doubts about Garofolo's story. While they were talking, another detective not involved in the case mentioned to them that Garofolo had recently been arrested for rape, burglary, and sodomy.

The detectives returned to Garofolo, who was read his *Miranda* rights, waived them, and initialed the *Miranda* rights card.

When confronted with their suspicions, Garofolo proceeded to tell the detectives the following story: Garofolo met Catherine Wilkinson at about 1:55 a.m. at Freckles and then went with her to the Brown Jug bar. After they left the Brown Jug in his car she took off her blouse and jeans and began to scream rape. He panicked, ran a red light, and, after noticing a police car nearby, drove up to Oak Beach Inn North. She was screaming so he smacked her, began to choke her, grabbed a nightstick he kept in his car, chased her and hit her with it six or seven times, then got into his car and drove away, throwing out a T-shirt and returning to Mario's. There he washed the car, his clothes, and the nightstick and threw the nightstick in the garbage at a nearby stationery store. He drove back to the Oak Beach Inn to retrieve his T-shirt and to pull the body into the woods. He then took Catherine's pocketbook and threw it into a dumpster and went home. He slept until around noon the next day and then returned to the scene to pull the body further into the woods where he covered it with leaves and debris. On his way to Mario's on the Sunken Meadow Parkway, he threw out the pair of shoes Catherine had worn the previous evening. When he reached Mario's he searched his car and found an earring, which he hid in the garbage behind the pizza shop along with the T-shirt he had been wearing. Finally, he washed some articles of his clothing in the bathroom at the pizzeria.

All of the items were discovered where he indicated they could be found, except for the victim's shoes. The police testified that they never hit, kicked, or in any way physically assaulted the appellant. The earring they found matched the one on the victim's body. According to expert testimony based on the marks on Catherine's chest and head, the nightstick they found was the murder weapon.

At trial, Garofolo's mother testified on his behalf. She stated that she was certain that he had come in at 3:00 a.m. and that she was in the bathroom when he entered

the house. She said that she had seen him at about noon the following day, but did not see him again until she saw him at the Suffolk County jail when he was in an unrecognizable physical condition. Garofolo's sister testified that she had been out all night the night before. Michael Lokkeberg, who did not even know Garofolo until he met him in the Suffolk County jail a week and a half before the second trial, testified that he had seen Catherine Wilkinson at Freckles on the evening of the murder, though he could not remember the night of the week or the month in which she was killed, but that the person Catherine left with that night was not Garofolo.

Evidence at the *Huntley* hearing revealed that the detectives who interrogated Garofolo had been told during the interrogation that Garofolo had previously been arrested for rape, burglary, and sodomy. Though they were not informed that Garofolo had an attorney on those charges, he in fact did have an attorney, as one might suspect. One detective said that Garofolo had protested that he did not need a lawyer because he had not done anything and was trying to help the police, but the detectives did not ask him if he had an attorney representing him in connection with the previous arrest.

## DISCUSSION

Garofolo's first claim is that the prosecutor acted improperly by (1) cross-examining his alibi witnesses without laying a proper foundation, (2) seeking to discredit the alibi witnesses in summation by pointing out that they had not come forward before with their testimony, and (3) referring to Garofolo's mother as "Momma," and suggesting in summation that "any mother" would lie for her son facing a murder charge. Appellant's second claim is that the instructions on the law concerning alibi evidence were erroneous and improperly

shifted the burden of proof of the truth of the alibi onto him when he had no burden of proving anything. The instructions are set out in the margin.[1] His third claim is that the trial court erred in failing to suppress his oral confession because the detectives knew of his recent arrest for rape and sodomy and at the very time of the interrogation the attorney who represented him on the first case was trying to locate him by telephoning different precincts. The appellant would have us apply the New York state constitutional case *People v. Bartolomeo, supra; see also People v. Smith,* 54 N.Y.2d 954, 455 N.Y.S.2d 145, 429 N.E.2d 823 (1981), as a matter of federal constitutional law even though the state courts declined to apply it to this case as a matter of state law.

The third claim need not detain us long since even before appellant's brief was filed the Supreme Court of the United States had decided *Moran v. Burbine, supra,* which controls this case. In *Burbine,* the Court held that there was no violation of the Sixth Amendment right to counsel or of the due process clause of the Fourteenth Amendment where, during the course of a custodial interrogation, the police failed to inform a suspect of his attorney's telephone call and where the police told the attorney that the suspect would not be questioned, at least in a case where the defendant did not ask for an attorney. This decision not only binds us, but also applies a fortiori to our case. Here there was no deception of the attorney and, indeed, while the detectives could have surmised that Garofolo was represented by counsel, there was no proof that they had any knowledge that he was in fact so represented. Assuming, as the trial court found, that there was exhaustion of state court remedies on this point and that there was no *Wainwright* procedural default, *Moran v. Burbine* precludes Garofolo's

---

1. If the defendant's guilt is not established beyond a reasonable doubt by reason of the truth of an alibi you must acquit him. The defendant is not required to prove an alibi beyond a reasonable doubt, but you must be satisfied as to the truth of the alibi.

   In other words, it is sufficient to raise a reasonable doubt by evidence concerning the defendant's whereabouts at a particular time when the crime was committed, if the jury believes that evidence that alibi itself entitles him to a verdict of not guilty. It is for you the jury to determine whether or not the alibi should be believed.

   Tr. 1142–43.

claim that his Sixth Amendment or due process rights were violated.

■ On the prosecutorial misconduct claim the district court, relying on *United States v. Modica*, 663 F.2d 1173 (2d Cir. 1981), *cert. denied*, 456 U.S. 989, 102 S.Ct. 2269, 73 L.Ed.2d 1284 (1982), and *Daye v. Attorney General*, 696 F.2d 186, 194 (2d Cir.1982), *cert. denied*, 464 U.S. 1048, 104 S.Ct. 723, 79 L.Ed.2d 184 (1984), properly held that there was exhaustion because the claim of prosecutorial misconduct had sufficiently familiar federal constitutional implications to be within the mainstream of constitutional litigation. The court then went on to conclude, however, that the alleged error did not meet the standard of *Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974), which indicates that constitutional error occurs only when the prosecutorial remarks were so prejudicial that they rendered the trial in question fundamentally unfair. *See Cobb v. Wainwright*, 609 F.2d 754, 756 (5th Cir.), *cert. denied*, 447 U.S. 907, 100 S.Ct. 2991, 64 L.Ed.2d 857 (1980); *United States ex rel. Haynes v. McKendrick*, 481 F.2d 152 (2d Cir.1973) (appeal to racial prejudice rendered trial fundamentally unfair); *see also United States v. Modica, supra.* We agree with the court's conclusion. This is not to say that the prosecutor's remarks were proper or appropriate;[2] they were not, but curative instructions were given by the trial judge.[3] Simply put, this case, like *Buchalter v. New York*, 319 U.S. 427, 431, 63 S.Ct. 1129, 1131, 87 L.Ed. 1492 (1943), *Webster v. Rees*, 729 F.2d 1078, 1080–81 (6th Cir.1984), and *United States*

*ex rel. Castillo v. Fay*, 350 F.2d 400, 401 (2d Cir.1965), *cert. denied*, 382 U.S. 1019, 86 S.Ct. 637, 15 L.Ed.2d 533 (1966); *see also United States v. Hasting*, 461 U.S. 499, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983), is not of constitutional magnitude. And in any event, harmless error doctrine may be applicable to prosecutorial misconduct involving statements to the jury, *see United States v. Hasting*, 461 U.S. at 510–12, 103 S.Ct. at 1981–82. Here, there was such clear evidence of guilt that the prosecutor's remarks must be considered harmless.

■ The same conclusion applies to Garofolo's claim that the instructions given regarding the alibi defense improperly shifted the burden of proof. Even if he is not derailed by *Wainwright, compare Martinez v. Harris*, 675 F.2d 51 (2d Cir.) (state court affirmance without opinion interpreted as being on procedural grounds and thus barring habeas review under *Wainwright*), *cert. denied*, 459 U.S. 849, 103 S.Ct. 109, 74 L.Ed.2d 97 (1982), *with Hawkins v. LeFevre*, 758 F.2d 866 (2d Cir. 1985) (interpreting state court silence as a decision on the merits when under state law no procedural default had occurred), Garofolo cannot get by *Rose v. Clark, supra*, which applied harmless error analysis to a jury charge of the type that was found unconstitutional in *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979). Everything points to Garofolo's guilt, not only his own admissible statement to the police, but also the items of tangible evidence found where he said they would be found, including the earring and the nightstick; his call to Mrs.

---

**2.** In addition to referring to Mrs. Garofolo as "Momma" and suggesting that she, like "any mother," would lie for her son, the prosecutor also said about witness Michael Lokkeberg:

> As long as we're on that young man from Nassau County, what about his background? You or I wouldn't want that kid in your house. Or I won't let our children associate with him.
>
>    \*    \*    \*    \*    \*    \*
>
> You or I would want nothing to do with that young man. When we judge credibility, don't we consider things like that? Don't we consider who this person is, what his background is, what he's done in his life, how he composes himself on the witness stand, what he looks

like, how he answers questions, how he answers questions on cross-examination?
Tr. 1041–42.

**3.** The judge stated:

> Now, you have heard both the district attorney and defense counsel sum up their respective cases. In doing so they commented upon the evidence and certain portions thereof as they recalled it to be.
>
> Bear this in mind, if your recollection differs from theirs take your own recollection and disregard theirs. After all, you're 12 in number and more apt to remember what was actually testified to collectively.
> Tr. 1106.

Wilkinson, the mother of the victim; and his other incriminating statements to various witnesses in the record.

Judgment affirmed.