**Robert L. FLOYD, Petitioner–Appellant,**

v.

**Larry MEACHUM, Commissioner of Correction, State of Connecticut, Respondent–Appellee.**

**No. 1183, Docket 89–2463.**

United States Court of Appeals, Second Circuit.

Argued May 3, 1990.

Decided June 29, 1990.

---

Timothy H. Everett, Hartford, Conn., University of Connecticut, School of Law Legal Clinic, for petitioner-appellant.

Steven M. Sellers, Wallingford, Conn., Asst. State's Atty., Chief, Appellate Unit, Office of the Chief State's Atty., for respondent-appellee.

Before LUMBARD, FEINBERG and WINTER, Circuit Judges.

FEINBERG, Circuit Judge:

This is one of those rare cases where the improper comments in a prosecutor's summation were so numerous and, in combination, so prejudicial that a new trial is required. Petitioner Robert L. Floyd appeals from a judgment of the United States District Court for the District of Connecticut, Peter C. Dorsey, J., denying his application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. In January 1985, after a jury trial in Connecticut Superior Court, Floyd was found guilty of using a motor vehicle without the owner's permission and of arson in the third degree. Floyd was sentenced to a four and one-half year term of incarceration for those crimes, and his convictions were affirmed on appeal. See *State v. Floyd*, 10 Conn.App. 361, 523 A.2d 1323 (1987). After exhausting state court remedies, Floyd brought the habeas suit now before us. For reasons given below, we reverse the judgment of the district court and remand the case with instructions that the writ be granted unless the State grants a new trial within 90 days of the issuance of the mandate.

## I. Background

We take our basic statement of facts from the majority opinion of the Connecti-

cut Appellate Court in *State v. Floyd*, 10 Conn.App. at 361–63, 523 A.2d 1323:

The jury could reasonably have found the following facts. In the early morning of October 1, 1983, a fire was discovered in the back seat of a car parked in a lot on Mansfield Street, New Haven. The fire appeared to have been burning only a short time prior to its discovery. The car had no license plates, its left front tire was flat and there was fresh damage to the front bumper and hood. The automobile was registered in the name of Robert Gattison but was being used with his permission by his sister, Sherry Gattison, the live-in companion of the defendant [Floyd]. There were no signs of forced entry and it appeared that the car had been started with a key. The complainant, Sherry Gattison, had not given the defendant permission to drive the car. The defendant and the complainant were in the midst of breaking-up, and the defendant was planning to vacate the couple's shared residence.

The complainant had parked her brother's car in front of the couple's apartment at 6 p.m. the prior evening, entered the apartment, and taken a nap. The defendant came home some two hours later, soon departed and returned at approximately 1:30 a.m. on October 1. At that time, the defendant told the complainant that he had taken the car and driven it into a tree and then had set the car afire and contemplated committing suicide in the flaming car. At approximately 3 a.m., the complainant received a telephone call from her mother who stated that the police found the vehicle in a parking lot. The complainant then told the defendant she was going to telephone the police, but refrained from doing so because the defendant threatened her. The complainant did not, in fact, relay her knowledge of the original crime to the police until October 24, 1983. The defendant's car was similarly set on fire some twenty hours later. The defendant accused the complainant's brother of setting the fire.

The defendant presented an alibi defense and alibi witnesses. The defendant's alibi that he was with friends until returning to the apartment at 9:30 p.m. conflicted, however, with the alibi witnesses' testimony that he was with them until 11:30 p.m.

The state's chief witness was the complainant Sherry Gattison. During the trial, she testified that she had not received any of the insurance proceeds from the car fire. The next day, the state's attorney informed the court that the complainant had, in fact, received $1400 in insurance proceeds but had been confused by defense counsel's questioning. The defense used this discrepancy to impeach the witness.

The nature of Floyd's claims requires us to discuss in some detail the summations of both the prosecutor and defense counsel. The prosecutor presented a relatively short initial summation to the jury and retained 45 minutes of her allotted one-hour summation for rebuttal. In her opening argument, the prosecutor told the jury that Floyd had "the motive, the opportunity and the method to commit these crimes." The prosecutor maintained that Floyd had at least three motives: revenge against Sherry Gattison, jealousy of suspected competitors for her affections and suicide. Next, the prosecutor claimed that Floyd's access to the car keys provided the opportunity. Finally, the prosecutor said that the method by which Sherry Gattison was deprived of the car was by the accident and the fire. The prosecutor anticipated that the defense would challenge Sherry Gattison's credibility; argued that "in order to acquit in this case, you would have to say you're throwing out all of Sherry Gattison's testimony"; proceeded to contrast the State's witnesses to the defense alibi witnesses; and claimed that the issues of credibility "couldn't be any more clear cut."

Since Floyd did not testify at trial, the prosecutor reviewed Floyd's pretrial statements to witnesses that were repeated in testimony. In addition, the prosecutor pointed to Floyd's alleged confessions to Sherry Gattison and Ronald Gattison and Floyd's statement to the police, regarding which one investigator claimed to have "a

specific personal recollection that this defendant said that he was home at 9:30." The prosecutor characterized Floyd as a liar 10 times in this brief opening statement and stated that his lying "if ever there was, is proof beyond a reasonable doubt." In closing her initial summation, she posed the question "Why would an innocent man lie? Why would an innocent man lie? Exactly."

In summation, defense counsel told the jury that Sherry Gattison also had the motive, opportunity and means to set the car on fire and insisted that the case hinged solely on the testimony of Sherry Gattison. Defense counsel then discussed evidence that Sherry Gattison had dissembled with her own insurance company concerning the car's true owner (her brother) and its true custodian (herself). Defense counsel also discussed Sherry Gattison's three-week delay in telling the police about Floyd's alleged confession and the inconsistencies in her testimony; maintained that Sherry Gattison was a "liar" or "lied" even under oath to the police and on the witness stand; and repeated this characterization over 30 times.

In discussing Sherry Gattison's credibility, defense counsel referred to the prosecutor, Mary Galvin, stating

And Miss Galvin expects you to believe her, and Miss Galvin says that this woman's story is worthy of belief and that the person who was jealous and revengeful in this case is Robert Floyd, Robert Floyd, who has had a relationship with another person, who resumes that relationship with the other person; and the woman who is left behind, Miss Galvin asks us to believe that she is not revengeful and jealous.

Defense counsel twice more referred to the prosecutor when discussing Sherry Gattison:

Miss Galvin may tell you, when she comes up here, that these mistakes in time were just mistakes; that anybody could get confused. Miss Gattison could get confused. She didn't mean to lie; but she told us that she had not told the truth and that she decided, before she

came into court, she would tell the truth. But then, when she came into court, she told something else that's not the truth; that she had not received any of the money of the insurance payments. I asked her that. I said, "You mean after all of the time that you were making payments on this car, your brother didn't give you any of the money back?" It didn't seem fair, did it? She said no, she didn't get anything. Then she came in the next day and she lied. She told us that what she had said the day before wasn't true. That was another time that she lied. That time she said she got confused. Nobody could have gotten confused about that question. When you get fourteen hundred dollars back, you know you've gotten fourteen hundred dollars back. You don't forget that.... The next day, she said she had been confused. That wasn't confusion. That was a lie. That was an important lie because it showed you that right in front of you, she would lie, the way she lied to the police and the way she's been lying from the beginning of this case. I don't know why she's been lying. Maybe you don't know why she's been lying. But she's a liar. We don't have to know why.

I don't have to prove anything in this case. Miss Galvin put her on the stand and she vouches for her credibility; and she expects you to convict this man on the basis of this woman's testimony.

On rebuttal, the prosecutor characterized defense counsel's summation as a personal attack and inferred from it an accusation that she had "put on a witness who I knew was committing perjury."

You were told that I was unethical. You were told that it was disrespectful to put Sherry Gattison on the stand. You were told, ladies and gentlemen of the jury, that me, not just the State of Connecticut—that I've been unethical.... Ladies and gentlemen, let me tell you, if you believe I've intentionally put on any perjured testimony in this case, if you believe, ladies and gentlemen of the jury, that I've lied to you, that I have misrepresented facts, then even though I'm not

here as Mary Galvin—I am here as the prosecutor for the people of the State of Connecticut—for my ethos, I have to say to you if you believe that, acquit this man.

The prosecutor then disputed defense counsel's characterization of Sherry Gattison as a liar:

I submit that if we go through the evidence in this case, there's only one person that has been proven a conclusive liar, and we already covered that in opening argument.... Who is the only person in this case who has been proven, by both sides, defense and State, to be a liar? Robert Floyd.

In her rebuttal, the prosecutor repeatedly informed the jury, over 30 times, that Floyd was a "liar" or "lied" to witnesses in his statements. In addition, the prosecutor maintained that Floyd was a "proven liar" and that not only the State's case but also his own witnesses "prove[d] him a liar."

In addition to these statements, the prosecutor made a number of references to the Fifth Amendment.

The defense relies on the Fifth Amendment presumption of innocence and on the Fifth Amendment burden of proof beyond a reasonable doubt in their argument to you. Ladies and gentlemen, as I said ... I am here as an Assistant State's Attorney who represents the people of the State of Connecticut and whose responsibility it is to attempt to see that justice is done. And, ladies and gentlemen, the Fifth Amendment burden of proof beyond a reasonable doubt is a protection for the innocent. As much as it is your responsibility to use and apply the Fifth Amendment burden of proof beyond a reasonable doubt standard to protect the innocent, it is your concomitant responsibility not to allow the Fifth Amendment burden of proof beyond a reasonable doubt to be a shield for the guilty. Ladies and gentlemen, your responsibilities are equal on both sides. The burden of proof beyond a reasonable doubt is a shield for the innocent. It is not a barrier to conviction for the guilty.

The prosecutor subsequently stated:

You have a man who has lied up and down the ranks of the New Haven Police Department and also to a fire investigator. Ladies and gentlemen, if that is not proof beyond a reasonable doubt, then, ladies and gentlemen, there can't be a case with proof beyond a reasonable doubt that is based on evidence.

In concluding her summation, the prosecutor made the following request:

I ask you to remember that your responsibility as jurors serving the Judicial Department of the State of Connecticut is to make sure that the Fifth Amendment burden of proof beyond a reasonable doubt is not an unwitting protection for the guilty.... The entire people of the State of Connecticut ask you to look through the confusion. The entire people of the State of Connecticut ask you to decide who is a liar, and this one citizen of the State of Connecticut asks you to decide who was telling the truth and who wasn't telling the truth.

... If, ladies and gentlemen of the jury, you believe I've been unethical, then I won't even ask you to do your job.... [I]f there was confusion in this case, from whence did it come? If there were facts left out in this case, from whence did that come? ... [Y]ou know that there is only one person in the world who lied up and down in every sentence he spoke about this case to the police and to fire officials. There's only one person who lied in every word they said. Ladies and gentlemen, that is this defendant, Robert Floyd. And as a representative of the people of the State of Connecticut, I ask that when you retire to that jury deliberating room, that you not let that Fifth Amendment burden of proof be anything more than it is because the Fifth Amendment burden of proof is a protection for the innocent and is not a shield to protect the guilty.

At no time during these arguments did the trial court intervene, nor was it asked to do so by either counsel. Upon the conclusion of the summations, defense counsel made a timely objection to the prosecutor's remark to the jury that the Fifth Amend-

ment was not a shield to protect the guilty, claiming that it was an oblique comment on Floyd's failure to testify. On this basis, counsel moved for a mistrial. The court proceeded to charge the jury without ruling on the pending mistrial motion. The court did not give a curative charge and was not requested to do so.

The general instructions given by the court were those usual to a criminal action. After giving the specific instruction concerning the charges against Floyd, the court instructed the jury that a person in police custody has no obligation to cooperate with the police and that an adverse inference was not permissible on the basis of a police officer's testimony that the defendant had failed to provide information to the police officers upon their request. In addition, the court informed the jury that it was its role as the trier of fact to determine what evidence was to be believed and what not to be believed, and further, that the comments of counsel were argument and not evidence. The court also instructed the jurors of their sworn duty to safeguard the rights of persons charged with crime by respecting the presumption of innocence and by making the State meet its burden of proving guilt beyond a reasonable doubt. The district court also added that the jurors must keep in mind that the presumption of innocence was made to protect the innocent and not the guilty. Defense counsel did not take an exception to any of these instructions.

After the jury verdict, Floyd filed motions for a new trial and for judgment of acquittal, which were heard preliminary to sentencing. In support of her motion for a new trial, defense counsel raised the three claims of error in the prosecutor's summation presented to the Appellate Court and again presented on this appeal. All of the motions, including Floyd's pending motion for a mistrial, were denied, and he was sentenced to a total term of incarceration of four and one-half years.

Floyd appealed his conviction to the Connecticut Appellate Court, claiming, among other things, that the prosecutor's closing argument was improper. In a 2–1 decision,

Judge Bieluch dissenting, the Appellate Court upheld the conviction, dealing separately with each alleged impropriety. First, the majority found improper the prosecutor's references to her personal ethics and her implicit "voucher" for Sherry Gattison's credibility, but considered that these remarks were invited by what it characterized as defense counsel's ad hominem attack on the prosecutor. Second, the majority concluded that the prosecutor's references to the Fifth Amendment presumption of innocence and its burden of proof beyond a reasonable doubt were not comments on Floyd's failure to testify. Finally, while not condoning the prosecutor's characterization of Floyd as a "liar," the majority considered the prosecutor's remarks to refer to facts in evidence, specifically, the testimony of Floyd's alibi witnesses which conflicted with his pretrial statements (these had been admitted into evidence). The majority evaluated the effect of the prosecutor's characterization in the context of what it termed as the "impassioned and improper comments of defense counsel and her use of the word 'liar.'" Thus, despite its findings of improprieties, the majority held that Floyd had not been denied his right to a fair trial.

Judge Bieluch's lengthy and vigorous dissent disagreed with the conclusions of the majority on all three claims of error, considering the record to demonstrate "abundantly" that Floyd was denied a fair trial by the prosecutor's "recklessly improper and irresponsibly prejudicial closing arguments." *State v. Floyd*, 10 Conn.App. at 371, 523 A.2d 1323 (Bieluch, J., dissenting). First, Judge Bieluch considered that the prosecutor, by submitting her ethics to the determination of the jury, impermissibly asked the jurors to decide between her professional integrity and the defendant's innocence. Second, the dissenting judge viewed the prosecutor's repeated invocation of the Fifth Amendment as an improper and oblique comment on Floyd's failure to testify and as a dilution of the presumption of innocence. Finally, the judge considered that the prosecutor, in repeatedly and emphatically stamping Floyd a liar, improperly expressed her own views on Floyd's

credibility, engaged in "prejudicial exaggeration" that exceeded the scope of the evidence and impermissibly equated his alleged lies with proof of guilt beyond a reasonable doubt. Id. at 385, 523 A.2d 1323.

The Connecticut Supreme Court denied certification to review the Appellate Court's decision, *State v. Floyd*, 203 Conn. 809, 525 A.2d 523 (1987), and the United States Supreme Court denied a petition for a writ of certiorari. *Floyd v. Connecticut*, 484 U.S. 859, 108 S.Ct. 172, 98 L.Ed.2d 126 (1987). Thereafter, appellant sought habeas relief under 28 U.S.C. § 2254 in the district court. Both Floyd and the State filed cross-motions for summary judgment. In October 1989, the district court granted the State's motion for summary judgment and denied Floyd's motion. This appeal followed.

## II. Discussion

■■■ 1. *Standard of Review.* At the outset, we note the narrow standard governing federal habeas corpus review of a petition brought by a state prisoner. The appropriate standard of review for a claim of prosecutorial misconduct on a writ of habeas corpus is " 'the narrow one of due process, and not the broad exercise of supervisory power.' " *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974)). Accordingly, the Supreme Court has instructed federal courts reviewing habeas claims brought by state prisoners and premised upon prosecutorial misconduct in summation to distinguish between "ordinary trial error of a prosecutor and that sort of egregious misconduct ... amount[ing] to a denial of constitutional due process." *Donnelly*, 416 U.S. at 647–48, 94 S.Ct. at 1873–74 (citations omitted). Under the standard of *Donnelly*, the question before a federal appellate court is whether "the prosecutorial remarks were so prejudicial that they rendered the trial in question fundamentally unfair." *Garofolo v. Coomb*, 804 F.2d 201, 206 (2d Cir.1986); *see Donnelly*, 416 U.S. at 645, 94 S.Ct. at

1872. Even under this narrow standard of review, we hold, under the totality of the circumstances presented here, that the cumulative effect of the prosecutor's persistent and clearly improper remarks amounted to such egregious misconduct as to render Floyd's trial fundamentally unfair.

## 2. *Prosecutorial Misconduct.*

A. *The Improper Comments.* As already indicated, on appeal Floyd raises three challenges to the prosecutor's summation. Although we necessarily address each claim in turn, we emphasize that our holding today is based on the cumulative effect of the three alleged categories of improper remarks. We also emphasize that, unlike many appeals raising claims of prosecutorial misconduct, this case does not involve one, or a few isolated, brief episodes; rather, it involves repeated and escalating prosecutorial misconduct from initial to closing summation.

First, Floyd contends that the jury would have understood the prosecutor's repeated references to the Fifth Amendment as an improper comment on his failure to testify and that the references were an impermissible attempt to dilute the State's burden of proof and to undermine the presumption of innocence. The State maintains that the prosecutor's remarks did no more than refer to the State's burden of proof beyond a reasonable doubt. We disagree. The prosecutor juxtaposed the "Fifth Amendment burden of proof beyond a reasonable doubt" with the argument that "if there was confusion in this case, from whence did that come?" She repeated, "If there were facts left out in this case, from whence did that come?" These references to the Fifth Amendment could well have been interpreted by the jury as a comment on Floyd's failure to testify. *Cf. United States v. Alfonso–Perez*, 535 F.2d 1362, 1366 (2d Cir.1976) (prosecutor's suggestion, while commenting on credibility of government witness, that " 'the man in the room' " could have " 'prove[d] otherwise,' but did not" implicitly called for an inference from defendant's failure to testify). Moreover, in common parlance and in com-

mon legal usage, as the dissenting judge in the Appellate Court recognized, the Fifth Amendment is equated with the privilege against self-incrimination, while the Fourteenth Amendment refers to the guarantees of due process of law. The prosecutor's repeated invocation of the Fifth Amendment "burden of proof" is puzzling, particularly since the guaranty of the Fifth Amendment right against self-incrimination applies to the states through the Due Process Clause of the Fourteenth Amendment. *See Malloy v. Hogan,* 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964).

In addition, the prosecutor's repeated remarks that the Fifth Amendment was "a protection for the innocent" and not "a shield" for "the guilty" incorrectly stated the law by diluting the State's burden of proof beyond a reasonable doubt and undermining the presumption of innocence. The heavy burden of proof that the United States Constitution, as interpreted by the Supreme Court, imposes on the prosecution means that the guilty will sometimes go free. As the dissenting judge in the Appellate Court pointed out, constitutional rights are not conditioned on guilt or innocence and "[t]he requirement of proof beyond a reasonable doubt for a conviction is neither a sword, nor a shield, but a necessary element of proof placed solely upon the prosecution." *State v. Floyd,* 10 Conn. App. at 390, 523 A.2d 1323 (Bieluch, J., dissenting). *Cf. United States v. Bifield,* 702 F.2d 342, 351 (2d Cir.) (whether similar language alone constitutes reversible error presents a close question and must be determined by its context), *cert. denied,* 461 U.S. 931, 103 S.Ct. 2095, 77 L.Ed.2d 304 (1983). The prosecutor's statements, if taken literally, would mean that a guilty person could never be acquitted on the basis of the presumption of innocence, and as a result of these misstatements, the jurors may have thought they were free to convict Floyd if they somehow felt or suspected he was guilty even if they were not convinced beyond a reasonable doubt.

We next turn to Floyd's claim that the prosecutor impermissibly asked the jury to pass on her personal integrity and professional ethics before deliberating on the evidence, thereby implying that she personally vouched for Sherry Gattison's credibility. We need not linger over this claim, because the State concedes the impropriety of these remarks, which violate the standards governing the professional responsibility of prosecutors. *See, e.g.,* ABA Standards for Criminal Justice 3–5.8(b) (1980) ("It is unprofessional conduct for the prosecutor to express his or her personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant."). In addition, the remarks were found improper by the Appellate Court. *See State v. Floyd,* 10 Conn.App. at 365, 523 A.2d 1323. The district court also agreed that "[i]t is unquestionably improper for a prosecutor to interject personal beliefs into a summation." *Cf. United States v. Puco,* 436 F.2d 761, 763 (2d Cir. 1971) (reversing conviction where prosecutor placed his own credibility in the balance against that of witness). The prosecutor's implied "voucher" for Sherry Gattison's credibility invited the jury to view its verdict as a vindication of the prosecutor's integrity rather than as an assessment of guilt or innocence based upon the evidence presented at trial.

Finally, the prosecutor characterized Floyd, who did not testify, as a liar literally dozens of times throughout her opening and closing summations. The State maintains that the prosecutor's characterization was a permissible comment on Floyd's conflicting pretrial statements to police. We disagree. It is true that this court has indicated that the "[u]se of the words 'liar' and 'lie' to characterize disputed testimony when the witness's credibility is clearly in issue is ordinarily not improper unless such use is excessive or is likely to be inflammatory." *United States v. Peterson,* 808 F.2d 969, 977 (2d Cir.1987). However, the use of the epithet here was the exception that proves that rule. Despite the State's suggestion that the prosecutor's characterization of Floyd as a liar was no more than "a momentary lapse of circumspection," the prosecutor used the terms "liar" or "lie" over 40 times in characterizing Floyd, who did not testify. We regard these re-

peated references as clearly excessive and inflammatory, as did the federal district court. *See United States v. Drummond,* 481 F.2d 62, 63–64 (2d Cir.1973) (reversing conviction where, among other things, prosecutor labeled defendant and defense witnesses as liars).

Even more troubling, many of the prosecutor's remarks erroneously equated Floyd's alleged lies with proof of guilt beyond a reasonable doubt. For example, the prosecutor stated about Floyd:

> You have a man who has lied up and down the ranks of the New Haven Police Department and also to a fire investigator. Ladies and gentlemen, if that is not proof beyond a reasonable doubt, then, ladies and gentlemen, there can't be a case with proof beyond a reasonable doubt that is based on evidence.

This remark clearly misstated the law, "in effect distort[ing] the burden of proof by suggesting incorrectly what the jury must find in order to reach a certain verdict." *United States v. Vargas,* 583 F.2d 380, 386 (7th Cir.1978); *accord United States v. Richter,* 826 F.2d 206, 209 (2d Cir.1987) (prosecutor improperly and misleadingly stated the law by framing the jury's relevant inquiry as veracity of government witness rather than guilt or innocence of defendant). As the dissenting judge in the Appellate Court observed, equating Floyd's alleged lies with proof of guilt beyond a reasonable doubt was "a wrongful, and irrevocably harmful, argument, and [an] interference with the function of the jury." *State v. Floyd,* 10 Conn.App. at 385, 523 A.2d 1323 (Bieluch, J., dissenting).

B. *Prejudice.* It is not enough, however, that the prosecutor's remarks were improper; rather, as indicated above, "constitutional error occurs only when the prosecutorial remarks were so prejudicial that they rendered the trial in question fundamentally unfair." *Garofolo,* 804 F.2d at 206. This court has applied a three-factor test in determining the existence of "substantial prejudice" where a prosecutor's summation is challenged: "the severity of the misconduct; the measures adopted to cure the misconduct; and the

certainty of conviction absent the improper statements." *United States v. Modica,* 663 F.2d 1173, 1181 (2d Cir.1981) (per curiam), *cert. denied,* 456 U.S. 989, 102 S.Ct. 2269, 73 L.Ed.2d 1284 (1982). Although *Modica* was a direct appeal from a federal conviction, we have also invoked *Modica* in collateral attacks on state court convictions to determine whether the trial was fundamentally unfair. *See Garofolo,* 804 F.2d at 206; *Johnson v. Harris,* 682 F.2d 49, 51 (2d Cir.) (per curiam), *cert. denied,* 459 U.S. 1041, 103 S.Ct. 457, 74 L.Ed.2d 609 (1982). But *see Sales v. Harris,* 675 F.2d 532, 541 n. 7 (2d Cir.), *cert. denied,* 459 U.S. 876, 103 S.Ct. 170, 74 L.Ed.2d 140 (1982). Accordingly, applying the *Modica* factors, we conclude that the cumulative effects of the prosecutor's improper statements denied Floyd a fundamentally fair trial.

First, the prosecutorial misconduct here was severe, as demonstrated by the studied pattern of improper remarks throughout the prosecutor's truncated initial summation and her expansive rebuttal, discussed above. The State maintains that the prosecutor's "voucher" (the only comment the State concedes was improper) was invited by the summation of defense counsel and points to the Appellate Court's similar conclusion. *See State v. Floyd,* 10 Conn.App. at 365, 523 A.2d 1323. Yet, when pressed at oral argument, the State was unable to point to any specific language to support its claim that defense counsel accused the prosecutor of knowingly putting on perjured testimony or otherwise acting unethically, and indeed, the record discloses none, despite the prosecutor's readiness to perceive a personal attack. Even if we were to accept the State's view, the remark was only one of many that we regard as improper and we still must decide whether the cumulative effect of the totality of the challenged statements, when viewed in context, affected the fundamental fairness of the trial. *Cf. United States v. Young,* 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985).

Second, the only arguably curative measure adopted by the trial judge—the normal instruction in the course of his charge that argument of counsel is not evidence—was inadequate. *See Modica,* 663 F.2d at

1182 (trial court's pattern instruction that arguments of counsel are not to be considered evidence was insufficient response to prosecutor's misconduct). The State contends that the failure of Floyd's counsel to except to the trial court's instructions on the ground that they were insufficient to ameliorate the prejudice from the prosecutor's remarks and the failure to request any curative instruction suggest that no more was needed to dissipate any prejudice. Defense counsel, however, did make the crux of her position known to the court, and in any event, did enough to preserve her position. Moreover, "some occurrences at trial may be too clearly prejudicial for ... a curative instruction to mitigate their effect," *Donnelly*, 416 U.S. at 644, 94 S.Ct. at 1872, and the cumulative effect of the prosecutor's remarks in this case were of such a character.

Third, it is "by no means clear" or "even probable" that appellant would have been convicted absent the prosecutor's misconduct. *Donnelly*, 416 U.S. at 644, 94 S.Ct. at 1872; *see Kampshoff v. Smith*, 698 F.2d 581, 588–89 (2d Cir.1983). The evidence against Floyd principally turned on the credibility of Sherry Gattison, who, as the Appellate Court found, was "the state's chief witness." *Floyd v. State*, 10 Conn. App. at 363, 523 A.2d 1323. Moreover, central to the defense theory of the case were Sherry Gattison's alleged motive, opportunity and means to commit the acts with which Floyd was charged, and the prosecutor herself conceded in summation that Sherry Gattison had the opportunity to do so. In addition, Sherry Gattison had delayed more than three weeks before notifying the police of the original crime, and her testimony, subsequently retracted, that she had not received any of the insurance proceeds from the car fire made her vulnerable to the accusation that she had lied on the stand. Neither the Appellate Court nor the district court characterized the State's evidence as overwhelming or even strong, but at best, in the words of the district court, "substantial enough to support the conviction." The district court further noted that "it would be speculative to find the

verdict could not have been affected by the impropriety."

In arguing for affirmance here, the State relies on *Darden v. Wainwright*, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986) and *United States v. Young*, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985). We note, however, that the present case is completely unlike *Darden*. In the instant case, the prosecutor's remarks implicated Floyd's specific constitutional right to remain silent rather than solely the more generalized right to due process; the evidence against Floyd was not heavy; defense counsel did not have the opportunity to respond to the prosecutor's most egregious remarks; and there was no indication that defense counsel made a tactical decision not to object to the improper comments in order to encourage the prosecutor to commit reversible error. *See id.* 477 U.S. at 181–83 & n. 14, 106 S.Ct. at 2471–72 & n. 14.

With respect to *Young*, it is true that the Court there considered the jury's acquittal on the most serious charge to reinforce its conclusion that the prosecutor's remarks did not undermine the jury's proper functioning. *See Young*, 470 U.S. at 18 n. 15, 105 S.Ct. at 1048 n. 15. In the instant case, Floyd was also acquitted of the most serious charge, larceny in the first degree. While Floyd's partial acquittal is certainly one factor to be taken into account, we believe, as indicated above, that the jury was led astray under the totality of the circumstances presented here. Our conclusion is reinforced by the fact that the gravamen of the prosecution was an arson case in which the alleged arsonist took a car without the permission of its owner. This was the purport of Sherry Gattison's own testimony which the prosecution sought to have the jury credit.

In sum, we conclude that the cumulative effects of the prosecutor's remarks, which included both inflammatory comments and erroneous statements of law, and which implicated Floyd's specific constitutional right to remain silent, diverted the jury from the charges on which Floyd was being tried, and from the fundamental principles

by which a jury must discharge its duty. *See United States ex rel. Haynes v. McKendrick,* 481 F.2d 152, 157 (2d Cir. 1973) (noting defendant's right to be tried on evidence in case and not on extraneous issues); *United States v. Lewis,* 447 F.2d 134 (1971) (same). While each instance of prosecutorial misconduct, standing alone, might not justify reversal, the effect of all of them requires it.

The judgment of the district court is reversed and the case is remanded for entry of judgment granting the writ unless the State grants a new trial within 90 days of the issuance of the mandate.