**UNITED STATES of America,**

v.

**Tony Jerome BARR.**

**No. 5:91–CR–49 (WWE).**

United States District Court,
D. Connecticut.

May 10, 1995.

Darrell B. Fields, The Legal Aid Society, Federal Defender Div., New York City, for Tony Jerome Barr.

## RULING ON MOTION TO VACATE CONVICTIONS

EGINTON, Senior District Judge.

Defendant, Tony Jerome Barr, moves to vacate his convictions pursuant to 28 U.S.C. § 2255 following a jury trial before this court. He is presently incarcerated.

Defendant moves to vacate on the grounds that he was denied effective assistance of counsel in violation of the Sixth Amendment to the United States Constitution and that he was denied a fair trial. He specifically alleges that trial counsel failed to realize defendant could be impeached on statements made at pretrial proffer sessions, that counsel failed to litigate the admissibility of defendant's criminal record, and that the prosecution behaved improperly at trial. For the reasons set forth below, the motion will be denied.

### Background

Defendant was convicted of conspiracy to possess cocaine in violation of 21 U.S.C. § 846, possession of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1), and carrying a firearm in connection with a drug offense in violation of 18 U.S.C. § 924(c)(1). He was sentenced to concurrent terms of 210 months imprisonment on the first two charges plus 60 months imprisonment on the firearms charge, consecutive to the other sentences.

Defendant's arrest and conviction stemmed from his participation in a drug deal in which a man named Arthur Preston arranged to act as the middleman for the sale of five kilos of cocaine by unnamed "Dominicans" to an undercover police officer, Terry Pireaux. At trial defendant claimed to have been participating as an informer for the Bridgeport Police Department. It is undisputed that defendant worked as an informer for the Department from at least 1984 until shortly before he was arrested on July 26, 1991.

On the morning of July 26, 1991, Preston, defendant, and co-defendant Samuel McAllister entered the apartment building where Preston lived with his mother and brother. Pireaux arrived soon after and "looked around" the apartment. When he entered the bedroom, he found defendant with a gun in his hand. Defendant testified it remained at his side. Pireaux testified that defendant raised the gun but did not point it at him.

Preston and Pireaux then argued over whether the money or the drugs should be presented first. Pireaux testified that defendant tried to calm them down and tried to push the deal along. Defendant's voice can be heard on the tape recording made by Pireaux. Preston eventually went into a bedroom and returned with a sample of cocaine on a sheet of paper. Preston and Pireaux then left the building to get the money. Preston was arrested outside.

Defendant testified that after they departed, he searched the apartment for drugs in vain and decided that there was no drug deal. He left the gun on the bathroom floor and began descending the back stairs of the three-story building. He and Pireaux testified that before defendant reached the bottom of the stairway, Pireaux saw him and pointed his gun at him. Defendant testified that he did not see any other enforcement personnel and did not know that Pireaux was an undercover officer. He testified that Pireaux said; "Come here."

Pireaux testified that he was surrounded by other enforcement officers and that he was the "last thing" defendant would have been able to pick out. He stated that the other people stood out in "bright blue raid jackets" that had "Police" and "FBI" written on them in "bright yellow." He testified that he and the other people yelled "halt" at defendant. Defendant fled back into the building and broke into the second floor apartment where a woman, Sorange Sotomayor, and her two children were present. Defendant testified that he asked to use the telephone but that the woman told him she did not have one. Sotomayor testified that he never asked.

Defendant testified that he looked out the front window and saw Officer Louis Piccirillo, the officer for whom he worked as an informer, talking to Agent John Kavanagh, whom defendant knew was an FBI agent. He testified that he therefore believed that "everything was going to be all right" and offered to pay Sotomayor to make amends for the intrusion. The FBI and police eventually forced their way into the apartment where they found defendant standing in the kitchen, and Sotomayor and the children sitting on the couch, crying.

On direct examination, defendant related that he had been convicted in 1986 for carrying a gun in his mother's car, in 1988 for second degree robbery after he took money from a man who owed him money, in 1988 for possession of a residual amount of cocaine, and in 1988 for assault after he shot a man. He testified that he had been out of prison since December, 1990.

On cross-examination, the government used the statements defendant made during a post-arrest meeting with Agent Kavanagh and at two proffer sessions to impeach his credibility. The proffer sessions took place on February 4, 1992 and June 11, 1992. At least one Assistant United States Attorney, FBI Agent John Kavanagh and defense counsel attended. On both occasions, counsel and defendant signed an agreement providing that, if defendant testified at trial, any statements made at the session that were materially different from his testimony would be used for impeachment purposes.

Defendant admitted to several discrepancies between his testimony and statements he made at the meeting with Agent Kavanagh. For example, defendant testified that he "busted into" the second floor apart-

ment but admitted that at the meeting he told Agent Kavanagh that he knocked on the door, that Sotomayor let him in, and that he then sat down and watched television. Defendant also testified that Preston told him the cocaine was stored in his house. However, he admitted that he told Kavanagh that Preston told him the unnamed "Dominicans" had the cocaine at another house.

Defendant also admitted to several discrepancies between his testimony and statements he made at the second proffer session. Although defendant testified he was acting as an informer on Friday, July 26, 1991, he admitted that at the second proffer session he stated he had planned to work for Preston at the deal on Friday and become an informer at a deal the following Monday. He admitted he had stated that Preston told him and McAllister they would be paid after the deal was completed, that defendant did not attempt to contact the police, and that he was a willing participant in the drug deal.

Defendant admitted that at the second proffer session, he stated he knew Pireaux was a police officer when he saw him at the bottom of the stairs. He stated he recognized Pireaux when he first saw him in Preston's apartment and that he later remembered seeing Pireaux buying drugs at a pool hall. He then realized that Pireaux was an undercover police officer.

Other statements made at the second proffer session relating to defendant's co-defendant were also used to impeach defendant. Defendant testified that McAllister left Preston's apartment before any discussion of the impending drug deal took place and that he was not involved. However, he admitted that at the second session, he stated that Preston spoke to both defendant and McAllister about the drug deal. He also stated that Preston told defendant to go to the bedroom in order to watch his back and told McAllister to go outside to watch for police.

On rebuttal, Officer Piccirillo testified that although defendant had worked as an informer for the Bridgeport Police Department since at least 1984, he was not acting as an informer on July 26, 1991. Piccirillo testified that he visited defendant at his home once between July 20 and July 24, 1991 to discuss

an individual with an outstanding arrest warrant. Defendant was to provide information about his whereabouts. Piccirillo testified that he knew nothing about the drug deal until he heard about a foot chase on his car radio and responded. He testified that when he arrived at the scene, he greeted Agent Kavanagh and saw Preston sitting in a police van but had no idea that defendant was involved.

Out of the presence of the jury, co-counsel objected to the fact that during trial counsel's direct examination of defendant, the prosecution was behaving unprofessionally. He stated that at the government table there were "guffaws, there were grins, there were smiles, there was communication between Agent Kavanagh [prosecutor] Fleischman." The court agreed and stated:

Yes, I think that's important. I observed the agent. The case agent should know better. So, Mr. Fleischman, lets keep the case agent under control. There was too much smiling. I spotted that too.

After summations, co-counsel stated that he had observed similar conduct during trial counsel's summation. He stated that he had also observed people at the government's table shaking their heads "no." The court stated that it had observed the same behavior. It observed that the behavior was

a little bit from [Mr. Fleischman] but much more [Mr. Fleischman] was sort of reacting to Kavanagh and I was disturbed. Kavanagh kept turning, making a lot of turning of the head and smiling and [Mr. Fleischman] would smile back at him.

Throughout the course of the trial, the court admonished the jury to disregard statements and actions by counsel. As part of the charge, the court gave the customary instruction that argument and questions by counsel are not evidence and that the attorneys are not sworn witnesses. It also stated:

In a criminal case I think it's important and especially in a case like this where you have dedicated—is the word I would use— dedicated counsel, dedicated to their respective advocacy positions, they are not shrinking violets or wall flowers, as you observed. If you had any preference or

sympathies or feeling of rebuff toward counsel because of their behavior, don't let that get into play.... So you should not have any view towards counsel that has anything to do with how you judge this case. It's a search for the credibility of the witnesses and people who have told the truth and the search for truthful evidence. It's not a popularity contest.

### Discussion

### Ineffective Assistance of Counsel

■ Defendant carries the burden to show both that counsel's level of representation fell below that required by the Sixth Amendment and that defendant was prejudiced by those deficiencies so as to deprive him of a fair trial. To establish the first prong, defendant must show that defense counsel's performance was neither reasonable under prevailing professional norms nor sound trial strategy. Counsel's performance must be evaluated as of the time of the performance and not with the benefit of hindsight. There is a "strong presumption that counsel's conduct might be considered sound trial strategy." *Strickland v. Washington*, 466 U.S. 668, 687–89, 104 S.Ct. 2052, 2064–65, 80 L.Ed.2d 674 (1984).

■ Defendant has not met his burden to show that trial counsel's level of representation fell below that required by the Sixth Amendment. The record indicates that counsel was fully aware that defendant could be impeached using his statements made at the proffer session and that a risk existed that defendant's prior criminal record would be introduced on cross-examination if he testified on his own behalf. Petitioner testified on his own behalf and introduced his criminal record as part of counsel's trial strategy both to dilute the impact of the cross-examination and to bolster defendant's own story.

With respect to the admission of the prior convictions, defendant alleges that, pursuant to Fed.R.Evid. 609, his convictions were not automatically admissible because they did not involve "dishonesty or false statement" and their probative value did not outweigh their prejudicial effect. Defendant contends that, therefore, counsel should have litigated

the admissibility of the prior convictions before putting defendant on the stand.

In hindsight's 20/20 vision, defendant might be correct. However, the trial record does not indicate that defendant testified about his convictions solely because counsel believed they might be brought out on cross-examination. It indicates that the introduction of defendant's criminal record was part of trial counsel's strategy to convince the jury that defendant was working as an informer during the drug deal. In his summation, counsel outlined his reasons for introducing defendant's criminal record. He stated:

> Please don't judge my client based upon his associations because it is the associations that he had that brought him into this case. The fact that he had a record and he had knowledge of the streets, and he had knowledge of P.T. Barnum projects and drug dealers and the people on the treats [sic], those were little reasons that he was chosen by Officer Piccirillo to be used as an informant....

This court commented at trial that it understood the reasons defendant testified. It continues to find the strategy reasonable under the circumstances. Defendant testified in order to convince the jury he was acting as an informer. As part of his testimony, it was essential to demonstrate to the jury how he became an informer and why he was valuable as an informer to the police. Trial counsel therefore made the strategic decision to question defendant about his prior convictions on direct examination in order to establish his background.

The trial record also indicates that counsel was aware that by taking the stand, defendant was susceptible to impeachment through his statements made at the prior proffer sessions. Counsel objected to their use on the grounds that they were not materially different from defendant's testimony, not on the grounds that they were inadmissible under any circumstances. Before defendant was actually questioned about the prior statements, counsel objected and stated:

> I suspect, Your Honor, from [the prosecutor's] initial questions that he is attempting to introduce the proffer agreement

concerning plea bargaining negotiations that were conducted with my client. I don't know if that's the case but I'm going to object to that, to any plea negotiations being entered in this court.

My client, as far as I'm concerned, never violated that agreement and I don't know whether they can unilaterally claim that he violated that plea negotiation agreement that he signed. If they want to introduce this into evidence now, if that's where he's going, I object to that.

Counsel never stated or intimated that he believed the agreement prevented the statements from being used to impeach defendant under any circumstances. His position was that the proffer statements could not be used because defendant's testimony was not materially different.

■ To meet the second prong of the *Strickland* test, defendant must show a reasonable probability that, but for the deficiencies in counsel's conduct, the result of the case would have been different. A probability is reasonable if it is sufficient to undermine confidence in the outcome. *Strickland v. Washington*, 466 U.S. at 694, 104 S.Ct. at 2068.

■ Even if trial counsel's performance were to be considered deficient, defendant has not met his burden to show he was unconstitutionally prejudiced by any deficiencies. Defendant argues that counsel's performance was prejudicial because it weakened his credibility. He contends that, as the success of his defense rested upon his credibility, but for counsel's deficient performance, there is a reasonable probability the jury would have believed him.

However, the government presented strong evidence that defendant was a full participant in an impending drug deal and was not acting as an informer. It presented evidence that Preston arranged to deliver to Pireaux five kilos of cocaine he intended to get from "Dominicans;" that on the morning the deal was to take place, defendant entered the apartment building carrying a bag with Preston; that defendant was standing in the bedroom with a loaded gun; and that defendant attempted to keep the deal on track.

Defendant did not deny that he was present at what he believed was going to be a drug deal between Preston and Pireaux. His voice is heard on the recording made by Officer Pireaux.

The government also presented compelling evidence that defendant fled from the police. Officer Pireaux testified that when he saw defendant on the stairway, he was surrounded by police officers in "raid" jackets that had "Police" written on them and that they all yelled "halt." He testified that defendant would have known he was a police officer. Officer Piccirillo testified categorically that defendant was not working as an informer for him on the day of defendant's arrest.

In addition, defendant's credibility was impeached by his statements to Agent Kavanagh made immediately after his arrest. At trial, defendant testified that Preston told him the cocaine was in Preston's apartment but admitted he told Kavanagh that Preston told him the cocaine was in another house. He also testified that he broke into the apartment but admitted that he told Kavanagh he knocked on the door of the second floor apartment and that Sotomayor had let him in. In light of the government's direct case, the testimony of the police officer on rebuttal, and impeachment through defendant's post-arrest statements, there is a reasonable probability that even without the impeachment evidence at issue, the jury would not have believed defendant was acting as an informant.

### Prosecutorial Misconduct

■ Defendant also argues that his convictions should be vacated on the grounds that the prosecution's misconduct during trial deprived him of a fair trial. A defendant seeking collateral relief pursuant to 28 U.S.C. § 2255 "must clear a significantly higher hurdle than would exist on direct appeal." *U.S. v. Frady*, 456 U.S. 152, 166, 102 S.Ct. 1584, 1593, 71 L.Ed.2d 816 (1982). Such relief is available only if the claimed error is a "fundamental defect which inherently results in a complete miscarriage of justice." The error must be a jurisdictional or constitutional defect of the type cognizable under a writ of

*habeas corpus.* *Hill v. U.S.*, 368 U.S. 424, 428, 82 S.Ct. 468, 471, 7 L.Ed.2d 417 (1962).

In *habeas* proceedings, the proper standard for prosecutorial misconduct is whether the prosecution's behavior caused substantial prejudice to the defendant, thereby rendering the trial fundamentally unfair. *Garofolo v. Coomb,* 804 F.2d 201, 206 (2d Cir.1986) *citing Donnelly v. DeChristoforo,* 416 U.S. 637, 642, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974). The determination of whether the behavior was prejudicial "depends heavily on the context of the case." It rests largely on three factors: (1) the severity of the misconduct; (2) curative measures taken by the court; and (3) the certainty of conviction absent misconduct. *U.S. v. La-Morte,* 950 F.2d 80, 83 (2d Cir.1991) *citing U.S. v. Young,* 470 U.S. 1, 12, 105 S.Ct. 1038, 1044, 84 L.Ed.2d 1 (1985).

The behavior of Special Agent Kavanagh and Assistant United State Attorney Fleischman was markedly unprofessional. *See* ABA Standards for Criminal Justice § 3–5.2 (Courtroom decorum) and § 3–5.8(b) ("It is unprofessional conduct for the prosecutor to express his or her personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant.") (1986); *Floyd v. Meachum,* 907 F.2d 347, 354 (2d Cir.1990). Head shaking and smiling may constitute expressions of personal belief.

However, this court does not believe the prosecution's unprofessional behavior would cause a reasonable jury to find defendant guilty in this case. While the behavior was clearly improper, it took place on two occasions in the course of an eight-day trial and was balanced by the curative instructions of the court. The court repeatedly admonished the jury to disregard the statements and actions of counsel and included a lengthy instruction in the jury charge. In addition, as discussed above, the government's case against defendant was strong. Thus, while the behavior of the government agents was unprofessional it was not so prejudicial that it rendered the trial fundamentally unfair.

*Conclusion*

For the reasons set forth above, the Motion to Vacate Convictions [32] is DENIED.