■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v PABLO FERNANDEZ, Appellant. [670 NYS2d 840] —Judgment, Supreme Court, New York County (Leslie Crocker Snyder, J.), rendered June 21, 1996, convicting defendant, after a jury trial, of murder in the second degree, and sentencing him to a term of 25 years to life, unanimously affirmed.

Defendant was hired by Jose Luis Marte to shoot Ramon Quintero, with whom Marte had an ongoing dispute. Marte was the head of a drug-selling gang known as the Red Top Crew, of which defendant was a member. On June 10, 1993, a man with a ponytail got out of a car in front of 504 West 135th Street and fired multiple shots from an automatic weapon at the persons in front of the building. Quintero was killed and another man was injured. Four eyewitnesses observed the shooting and identified defendant at trial as the shooter. Defendant admitted to two members of another drug gang that he had shot Quintero and "left him like a piece of shit on the floor."

On appeal, defendant contends that the trial court erred in denying his CPL 330.30 motion to set aside the verdict on the ground that the prosecution failed to disclose exculpatory Brady material (see, Brady v Maryland, 373 US 83). The alleged Brady material was the allegation that one of the police

witnesses who testified at this defendant's trial, Police Officer Melino, had been under investigation for selling drugs in 1991 or 1992, a few months before he entered the police academy. In fact, Officer Melino was arrested based on these allegations two days after the jury convicted defendant in this case.

A hearing was held on defendant's motion, at which Assistant District Attorney (ADA) William Burmeister of the District Attorney's Office Official Corruption Unit testified. The hearing evidence disclosed that on January 16, 1996, New York State Troopers in the White Plains office notified members of the New York City Police Department's (NYPD) Liaison Unit that Officer Melino had been under investigation for selling drugs in 1991 or 1992.* Two detectives from the Liaison Unit went to White Plains to investigate, but it was not until January 30, 1996 that Chief Kelleher of IAB was informed of the allegations concerning Officer Melino. On that date, Kelleher was in the midst of a regular meeting with ADA Burmeister regarding numerous official corruption matters when Melino's name fortuitously came up. Kelleher informed ADA Burmeister that he had received the drug dealing allegations against Melino earlier that day. On February 1, 1996, the date Melino was testifying in the trial of this case, ADA Burmeister and Chief Investigator Rosenzsweig set up a meeting for February 5, 1996, the following Monday, with the Liaison Unit detectives and others to discuss the matter.

At the February 5th meeting, the Liaison Unit detectives revealed that in 1991-1992 Melino was under investigation for selling a kilogram of cocaine to an undercover officer. ADA Burmeister was "very skeptical" of the allegations, since he found it extremely surprising that such serious accusations had not resulted in an arrest or otherwise been pursued for many years. Accordingly, in order to determine whether the charges had any substance, Burmeister decided to review the State Troopers' case file on Melino, and requested an interview with the undercover officer who allegedly purchased drugs from him. On February 6th, the date of the jury's verdict in this case, Burmeister received part of the Melino file and interviewed the undercover officer. Between February 6-8, Burmeister listened to the eight audiotapes purportedly revealing Melino's involvement in the drug sale. On February 8, Burmeister determined that the charges were substantiated and ordered

---

* The NYPD's Liaison Unit is designed to facilitate communications with other jurisdictions around the state where NYPD officers may live or engage in misconduct. It apparently works closely with the NYPD's Internal Affairs Bureau (IAB), although ADA Burmeister testified it was a separate unit.

Melino's arrest. Burmeister testified that he was unaware that Melino was testifying in this or any other cases, that he was not sure where Melino was presently assigned and that it is difficult to determine where an officer is testifying unless he is the arresting officer in a case. Defense counsel was informed of Melino's arrest by letter dated February 15, 1996, giving rise to defendant's CPL 330.30 motion.

In denying defendant's motion, the trial court found that the prosecution's *Brady* obligation was not triggered until February 8, 1996, when ADA Burmeister determined that the allegations were substantiated and Melino's arrest ordered. The court further concluded that the nondisclosure was, in any event, harmless since Melino's testimony was "largely collateral" to the issues in the trial, especially in light of the four identifying witnesses and defendant's admissions. Given the collateral nature of Melino's testimony, the court determined that there was no reasonable probability that had the information concerning Melino been disclosed the result of the proceeding would have been different.

We affirm the denial of defendant's CPL 330.30 motion. It is beyond dispute that "[a] prosecutor's duty of disclosing exculpatory material extends to disclosure of evidence impeaching the credibility of a prosecution witness whose testimony may be determinative of guilt or innocence (*People v Fein*, 18 NY2d 162, *cert denied* 385 US 649; *see, Giglio v United States*, 405 US 150, 154; *see, People v Steadman*, 82 NY2d 1, 7)." (*People v Baxley*, 84 NY2d 208, 213.) Conversely, where the impeachment information has no bearing on defendant's guilt or innocence, such as where the prosecution witness's misconduct is completely unrelated to the trial at which he is testifying and the witness's testimony is not crucial to the prosecution's case, its nondisclosure does not constitute a *Brady* violation (*see, People v Martin*, 240 AD2d 5; *People v Vasquez*, 214 AD2d 93, 101-102; *People v Shakur*, 169 Misc 2d 961).

As defendant's request for exculpatory material in the present case was non-specific, the standard of materiality is whether there was a reasonable probability that had the evidence been disclosed, the result of the proceeding would have been different (*People v Chin*, 67 NY2d 22, 33; *People v Vasquez, supra*). That standard was not met here. Contrary to defendant's contention, Melino's testimony was hardly "pivotal" in securing his conviction. Melino testified regarding his investigative efforts in attempting to re-contact witnesses in the unsolved Quintero homicide, and recanvassing of the area for additional witnesses. He and another officer were success-

ful in locating two witnesses who observed the shooting and participated in interviewing them. He further testified that he had assisted in escorting two eyewitnesses to a lineup. This type of testimony concerning police investigative work is generally not the type that, if subject to impeachment, is material to a defendant's guilt or innocence (*see, People v Shakur*, 169 Misc 2d, *supra,* at 975 [testimony of officer, accused of unrelated misconduct, regarding sexual assault victim's physical appearance and statements was mostly cumulative and peripheral to the People's case]; *cf., Kyles v Whitley*, 514 US 419 [nondisclosure of informant's statements contributed to *Brady* violation since disclosure would have raised opportunities to attack the thoroughness and good faith of investigation]).

Defendant suggests that Melino's testimony was material to guilt or innocence because, given his role in interviewing witnesses and in escorting them to a lineup, he had the opportunity to improperly influence the witness's identification of defendant, a contested issue at trial. He claims that had the defense been aware of Melino's misconduct, his cross-examination strategy would have been different and the identifications substantially undermined. This theory is based entirely on supposition. Defense counsel's cross-examination of Melino and the other officers at both the suppression hearing and trial concerning the lineup revealed no irregularities, and, significantly, Melino's testimony was corroborated in nearly every respect by other officers (*see, People v Martin, supra*; *People v Vasquez, supra*). There is not one iota of evidence that the identifications were the product of coercion or suggestion, or that Melino harbored some secret motive to influence four witnesses to falsely implicate the defendant. Absent some other indication that the identifications were unreliable, the hypothetical and remote possibility that they were influenced by a corrupt officer is too slender a reed upon which to grant a new trial.

Moreover, Melino's criminal background must be examined in light of the considerable evidence offered by the prosecution at trial. Four eyewitnesses identified defendant as the shooter at trial, and all gave mostly consistent descriptions to the police including the unique characteristic that the shooter had a "grayish" ponytail. Two members of the drug gang Yellow Top Crew, which was affiliated with Marte's Red Top Crew, testified pursuant to cooperation agreements, regarding Marte's plan to kill the deceased and defendant's subsequent boasting as to having shot the deceased. Convincing the jury that all four identifications were the product of Melino's improper influ-

ence, and that the remaining testimony implicating defendant in the murder was somehow unworthy of belief, would have been a daunting task for defense counsel, if not an impossible one. Thus, given the overwhelming evidence of defendant's commission of the murder, we conclude that there is no reasonable probability that had the jury heard of Melino's misconduct, which was unrelated to this case and occurred before he was a police officer, the jury would have rejected the identification evidence and acquitted defendant (*People v Vasquez, supra*; *People v Shakur, supra*; *cf., Kyles v Whitley, supra*).

The witness Mejias's testimony regarding Marte's statements that defendant had been hired to kill the deceased was properly admitted under the coconspirator exception to the hearsay rule (*see, People v Salko,* 47 NY2d 230, 240; *see also, People v Tran,* 80 NY2d 170, 179-180). A prima facie case of conspiracy was established without resort to Marte's statements (*see, People v Salko, supra*; *People v Alwadish,* 67 NY2d 973, 974; *People v Owusu,* 234 AD2d 893, *lv denied* 89 NY2d 1039), and these statements were clearly in furtherance of a continuing conspiracy (*see, People v Rivera,* 192 AD2d 363, *lv denied* 82 NY2d 758). Even if the witness Rivera's similar testimony was improperly admitted, that testimony was cumulative, as well as harmless in light of the overwhelming evidence of guilt (*People v Valle,* 235 AD2d 352, *lv denied* 90 NY2d 865).

We have considered defendant's remaining contentions and find them to be without merit. Concur—Milonas, J. P., Rosenberger, Williams and Mazzarelli, JJ.