**Kareem EDMONDS, Petitioner,**

v.

**Superintendent McGINNIS, Southport Correctional Facility, Robert Morgenthau, Respondents.**

**No. 97 Civ. 7001(DC).**

United States District Court, S.D. New York.

July 2, 1998.

dant's cross-motion for judgment on the pleadings is denied.

Kareem Edmonds, Pine City, NY, pro se.

Robert M. Morgenthau, District Attorney of New York County by Karen Heiss Eisen, Assistant District Attorney, New York City, for Respondents.

## MEMORANDUM DECISION

CHIN, District Judge.

Petitioner Kareem Edmonds brings this pro se petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his January 29, 1992 conviction in the Supreme Court of the State of New Court, New York County, for murder in the second degree (New York Penal Law § 125.25[1]). For the reasons set forth below, the petition is dismissed.

## BACKGROUND

In the mid–1980's, Troy Sutton began selling crack out of a partially abandoned tenement building on West 140th Street in Manhattan. Petitioner, along with Jamal Eaddy, Ernest Rock, Frederick Chapple, and Denshire Moon, worked for Sutton selling drugs. Petitioner's duties consisted primarily of acting as a lookout, while the others, who were higher in the chain of command, performed duties such as transporting and protecting the drugs, and maintaining discipline.

In the fall of 1989, sixteen-year-old Alton Martin, who was not a member of the Sutton organization, sold a gun to Jamal Eaddy. A few weeks later, Eaddy discovered that the gun was defective and relayed this information to petitioner and other Sutton organization members. Denshire Moon, who was good friends with Martin, offered to pay Eaddy the money he had spent on the defective gun. Petitioner, however, vowed to kill Martin, responding, "Don't worry about it. I'll kill him." (Tr. 533–34).

On December 8, 1989, petitioner took a gun from the Sutton organization's gun collection, on the fourth floor of 212 West 140th Street. Accompanied by Eaddy, petitioner ran to Seventh Avenue, where the two had seen Martin just minutes earlier. At roughly the same time, Evelyn Gethers had gone to use a public telephone on a well-lit corner of West 140th Street and Seventh Avenue. She saw petitioner, still accompanied by Eaddy, approach Seventh Avenue carrying a long-barreled gun. She then saw the two confront Martin, on Seventh Avenue between 139th and 140th Streets. Evelyn Gethers watched as petitioner had a brief conversation with Martin. She then witnessed petitioner fire a single gunshot into Martin's head, then turn and run around the corner of 140th Street and Eighth Avenue. Martin died instantly.

Petitioner and Eaddy immediately returned to the apartment on West 140th Street, where they discussed the shooting with Rock. Eaddy called the petitioner "a little faggot" for "being hesitant[ ]" (Tr. 240), and told another member of the organization to replace the gun "in the stash." (Tr. 276). The next night, December 9, 1989, Sutton bragged to other members of the organization that petitioner had "got[ten] points" for shooting Martin (Tr. 323), and petitioner in-

deed confirmed that he had "smoked [Martin] in the head for fronting us." (Tr. 397).[1]

Roughly four and one-half months after the shooting, Gethers saw petitioner near 140th Street and Seventh Avenue. She contacted the police. On December 7, 1990, she identified petitioner from a photo array as someone she had seen "during the summer," who had given her "flashbacks to the night of the homicide...." (Wade Tr. 17–35). On April 22, 1991, the police arrested petitioner, and called Gethersin to view a line-up. After studying the six men in the line-up for about ten seconds, Gethers identified petitioner as "the person with the gun" who pulled the trigger. (Wade Tr. 45–46).

Petitioner moved to suppress the identification, arguing that age and height disparities between himself and the stand-ins rendered the line-up unduly suggestive. The Supreme Court of the State of New York, New York County, conducted a *Wade* hearing, and on November 4, 1991, the court held that the line-up was "fairly conducted with no impermissible suggestiveness whatsoever...." (Tr. 70). While noting that there were age and height disparities between petitioner and the other stand-ins, the court found that the disparities were not significant. The participants were found to be "remarkably similar" in general appearance: all had similar skin tones and hairstyles; even the ten-year disparity between petitioner and the next oldest stand-in was "not viewed at all in looking at the photographs...." (Tr. 70–71). Accordingly, the court denied petitioner's motion to suppress the identification. (Tr. 70–71).

Petitioner was found guilty by a jury on November 21, 1991, of murder in the second degree (New York Penal Law 125.25[1]). On January 29, 1992, he was sentenced to an indeterminate term of imprisonment from twenty-five years to life. The Appellate Division, First Department, affirmed, *People v. Edmonds,* 223 A.D.2d 455, 637 N.Y.S.2d 71 (1st Dep't 1996), and the New York State Court of Appeals denied petitioner's request

for leave to appeal, *People v. Edmonds,* 88 N.Y.2d 984, 649 N.Y.S.2d 391, 672 N.E.2d 617 (Ct.App.1996). Petitioner also sought a writ of error coram nobis, which the Supreme Court, Appellate Division denied, 671 N.Y.S.2d 575 (1st Dep't 1998). He now petitions this court for a writ of habeas corpus.

Petitioner makes five separate claims for relief in his petition: (1) the trial court improperly discharged a sworn juror over defense counsel's objection; (2) the trial court improperly admitted evidence of uncharged crimes, *i.e.,* petitioner's alleged involvement in a drug organization; (3) the trial court improperly admitted certain hearsay statements into evidence; (4) the trial court improperly admitted the line-up photographs; and (5) the prosecutor engaged in misconduct during her summation.

## DISCUSSION

### A. *Standards for Federal Habeas Corpus Relief*

■ To obtain federal habeas corpus relief, a petitioner must demonstrate a federal constitutional violation. Otherwise, habeas corpus relief must be denied. *Heck v. Humphrey,* 512 U.S. 477, 480, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994). Prior to 1996, a petitioner for habeas corpus relief under 28 U.S.C. § 2254 was required to exhaust all available state court remedies before a federal court could consider the merits of his petition. *Rose v. Lundy,* 455 U.S. 509, 510, 102 S.Ct. 1198, 71 L.Ed.2d 379, (1982). This included a requirement that the petitioner present the federal constitutional legal theories upon which his claim was based to the state court, to give the state court an "opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Picard v. Connor,* 404 U.S. 270, 275–77, 92 S.Ct. 509, 30 L.Ed.2d 438, (1971) (internal quotations omitted); *see also Duncan v. Henry,* 513

---

1. A Sutton member explained that he understood this comment to mean that petitioner had killed Martin the day before. (Tr. 329). "To smoke" someone is to kill them; to "get points" means to get credit; and "to front on" someone can mean

anything from treating them with disrespect to trying to rob them. When petitioner referred to "us," it was interpreted as referring to the Sutton drug organization, 212 West 140th Street. (Tr. 324–26).

U.S. 364, 365, 115 S.Ct. 887, 130 L.Ed.2d 865 (1995).[2]

In *Rose v. Lundy*, the Supreme Court explained that the exhaustion doctrine was "designed to protect the state courts' role in the enforcement of federal law and prevent disruption of state judicial proceedings." 455 U.S. at 518, 102 S.Ct. 1198. Accordingly, the Second Circuit has held that a federal habeas petitioner must have put the state appellate court on notice that a federal constitutional claim is at issue. *See Grady v. LeFevre*, 846 F.2d 862, 864 (2d Cir.1988); *see also Grey v. Hoke*, 933 F.2d 117, 119 (2d Cir.1991) (requiring that a state court be "fairly apprised" that petitioner is raising a federal constitutional claim); *Daye v. Attorney General of the State of New York*, 696 F.2d 186, 191 (2d Cir.1982) (en banc), *cert. denied*, 464 U.S. 1048, 104 S.Ct. 723, 79 L.Ed.2d 184 (1984).

Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), federal courts now have discretion to deny petitions on the merits, even when the petitioner has failed to exhaust his state court remedies. Thus a reviewing court is no longer required to dismiss claims for failure to exhaust. 28 U.S.C. § 2254(b)(2) (as amended by the AEDPA).[3]

■ In the case at bar, petitioner has failed to exhaust his state court remedies. Although petitioner raised his claims in the highest court in the state, he nonetheless failed to put the state courts on notice of the federal constitutional claims he alleges were violated. Petitioner relied largely on state law, with only brief references to the United States Constitution in each of his point headings. Four of petitioner's five claims for federal habeas corpus relief were supported solely by state law, and the fifth cited only one federal case, and was supported primari-

ly by state law. Consequently, it is doubtful that the state courts considering petitioner's appeals were fairly apprised of the federal rights he alleged were violated, because they too confined their analyses solely to state law principles. Notwithstanding petitioner's failure to fully exhaust his state court remedies, however, I have reviewed each of his claims on the merits, and I find that petitioner is not entitled to federal habeas corpus relief on the merits. I address each of petitioner's claims in turn.

## B. *The Discharge Of A Sworn Juror*

■ Petitioner asserts as his first ground for habeas corpus relief that the trial court improperly discharged a sworn juror over defense counsel's objection, thereby violating petitioner's constitutional right to be tried by a jury of his choice. He argues that the court, upon receiving notice that one of the jurors wished to be excused from her duties, should not have discharged the juror over defense counsel's objection. Instead, petitioner insists that the court should have inquired further of the juror, or delayed the proceedings for another day.

■ Although petitioner cites no federal law in support of his claim, the federal law on point is clear: " '[S]ubstitution of an alternate juror for reasonable cause is the prerogative of the court and does not require the consent of any party.' " *United States v. Millar*, 79 F.3d 338, 342 (2d Cir.1996) (quoting *United States v. Floyd*, 496 F.2d 982, 990 (2d Cir.), *cert. denied*, 419 U.S. 1069, 95 S.Ct. 654, 42 L.Ed.2d 664 (1974)). Upon hearing the juror's request, the trial court conducted an inquiry on the record as to the reasons the juror, Ms. Russo, felt she could no longer serve. Ms. Russo informed the court that she had a real estate closing in three days,

**2.** The Supreme Court has noted that it "doubt[s] that a defendant's citation to a state-court decision predicated solely on state law ordinarily will be sufficient to fairly apprise a reviewing court of a potential federal claim...." *Anderson v. Harless*, 459 U.S. 4, 7 n. 3, 103 S.Ct. 276, 74 L.Ed.2d 3 (1982). Similarly, in *Duncan*, the Court held that the respondent's federal habeas corpus claims were unexhausted, precisely because the respondent had failed to give the state court an adequate opportunity to address the federal claims. The Court remarked that "[t]he state court, when presented with respondent's claim of error under the California Evidentiary Code, understandably confined its analysis to the application of state law." 513 U.S. at 366, 115 S.Ct. 887.

**3.** 28 U.S.C. § 2254(b)(2) now states, in relevant part: "An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."

and that she feared that she would "lose the house" as well as her substantial down payment, and possibly her mortgage commitment, if she were not present. (Tr. 210).

The court held a brief bench conference and determined that Ms. Russo might have trouble concentrating during deliberations if she were not excused. In light of the fact that the trial was already ten days behind schedule, and Ms. Russo would have to lose the entire day of the closing, the court concluded that it should dismiss Ms. Russo rather than suffer further delay. Moreover, although it was by no means obliged to do so, the court offered to replace Ms. Russo with the alternate of petitioner's choice. The trial court was well within its discretion when it discharged Ms. Russo for reasonable cause and substituted an alternate juror in her place. Accordingly, petitioner's first claim for relief is denied.

## C. The Admissibility of Evidence Relating To Petitioner's Involvement In The Troy Sutton Organization

■ Petitioner asserts as his second ground for habeas corpus relief that the trial court improperly admitted evidence of uncharged crimes to show that he was a member of the alleged Sutton drug organization. He claims that this evidence was used to prove that as a result of committing murder, he was rewarded with a higher status in the organization. Petitioner insists that this evidence was not relevant to prove motive, was highly prejudicial, and was introduced improperly to demonstrate petitioner's propensity to commit crimes.

■ Federal Rule of Evidence 404(b) prohibits the use of evidence of other crimes, wrongs, or acts to prove the character of a person, or to show that a person has a propensity to commit certain crimes. *United States v. Pipola*, 83 F.3d 556, 565 (2d Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 183, 136 L.Ed.2d 122 (1996); *see also United States v. Germosen*, 139 F.3d 120 (2d Cir.1998); Richard T. Farrell, *Prince, Richardson on Evidence* at § 4–501 (11th ed.1995). This rule, however, is not absolute. It provides that such evidence may be admissible to show "proof of motive, opportunity, intent, plan,

knowledge, identity, or absence of mistake or accident." *Pipola*, 83 F.3d at 565; *see also Richardson on Evidence* at § 4–501. The trial court is afforded broad discretion in determining the admissibility of evidence of other crimes or bad acts. Accordingly, the rulings of the trial court will not be overturned absent a finding of clear abuse of discretion. *Pipola*, 83 F.3d at 566.

Here, the trial court did not abuse its discretion in admitting the evidence of other crimes or bad acts, for the evidence was admissible to prove two possible motives for petitioner's alleged murder of the deceased. First, the evidence showed that petitioner retaliated against Martin for selling a defective gun to a fellow member of the Sutton organization. In fact, petitioner himself, upon learning of the defect, rejected Moon's offer of a refund, stating "Don't worry about it. I'll kill him." (Tr. 533–34). Second, after petitioner had committed the murder, he bragged to other organization members that he had "smoked [Martin] in the head for fronting us." (Tr. 397). The jury could have reasonably inferred from this evidence that petitioner, seeking to improve his standing, murdered Martin for disrespecting the Sutton organization.

Moreover, the trial court limited the extent and nature of this evidence to that which could be presented in "sixty-seconds' worth of testimony." (Tr. 30–31). The court twice instructed the jury that it was admitting the evidence "strictly for [the] purpose of put[ting] the alleged events in context, to give [the jury] some understanding of the background and context of the charges...." (Tr. 230). It further advised the jury that petitioner was not charged with any drug crimes, and accordingly, they were not to consider the evidence for any purpose other than as context for the crime charged. (Tr. 665). In view of the court's limiting instructions, as well as the propriety of admitting such evidence under applicable law, the admission of this extrinsic evidence was proper, and was offered for a purpose other than to show propensity. The trial court's ruling was carefully considered and confined in scope. Accordingly, petitioner's second claim for relief is denied.

## D. The Admissibility Of Hearsay Statements

Petitioner asserts as his third ground for habeas corpus relief that the court improperly admitted hearsay statements into evidence, thereby depriving him of his Sixth Amendment right to confrontation and cross-examination. He claims that the court erred when it ruled that statements were admissible under the excited utterance and co-conspirator exceptions to the hearsay rule. Additionally, petitioner argues that the court improperly allowed opinion testimony from a lay witness regarding these statements.

The Confrontation Clause of the Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const. amend. VI. This right, however, is subject to certain well-established exceptions. For example, the Supreme Court has held that the Confrontation Clause " 'permits, where necessary, the admission of certain statements against a defendant despite the defendant's inability to confront the declarant at trial[.]' " *Idaho v. Wright,* 497 U.S. 805, 814, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990) (quoting *Maryland v. Craig,* 497 U.S. 836, 847, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990)). *See also Ohio v. Roberts,* 448 U.S. 56, 63, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980) (recognizing that a literal reading of the Confrontation Clause would "abrogate virtually every hearsay exception, a result long rejected as unintended and too extreme").

Firmly rooted hearsay exceptions will generally satisfy the Confrontation Clause, because of "the weight accorded longstanding judicial and legislative experience in assessing the trustworthiness of certain types of out-of-court statements." *Wright,* 497 U.S. at 817, 110 S.Ct. 3139. Included in the list of firmly rooted hearsay exceptions are the "co-conspirator" exception to the hearsay rule, *Bourjaily v. United States,* 483 U.S. 171, 183, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987) ("[T]he co-conspirator exception to the hearsay rule is firmly enough rooted in our jurisprudence...."), as well as the "excited utterance" exception to the hearsay rule, *United States v. Tocco,* 135 F.3d 116, 128 (2d Cir.) ("An excited utterance is one such firmly established exception that escapes independent Confrontation Clause analysis."), *cert. denied,* —— U.S. ——, 118 S.Ct. 1581, 140 L.Ed.2d 795 (1998).[4]

■ Petitioner complains specifically about statements made by two alleged co-conspirators, Jamal Eaddy, a member of the Sutton drug organization, and Troy Sutton himself. Before the trial commenced, the trial court ruled that Rock, a member of the Sutton organization, was permitted to testify that minutes after Martin's death, Eaddy called petitioner "a little faggot" for "being hesitant." (Tr. 85–86). The court found these statements admissible under the co-conspirator and excited utterance exceptions to the hearsay rule. Additionally, the court allowed Chapple, another organization member, to testify that on the night after the murder, Sutton remarked that petitioner had "got[ten] points" for murdering Martin. The court ruled that this testimony was permissible as it provided a context for petitioner's own admission that he had "smoked Martin", and in fact, without Sutton's statement, petitioner's admission made "absolutely no sense." (Tr. 84–86).

■ Eaddy's two statements were properly admitted under the co-conspirator exception to the hearsay rule. New York law provides that "[a] declaration by a coconspirator during the course of and in furtherance of the conspiracy is admissible against another coconspirator as an exception to the hearsay rule." *People v. Bac Tran,* 80 N.Y.2d 170, 589 N.Y.S.2d 845, 850, 603 N.E.2d 950 (Ct.App.1992) (citations omitted). *See also People v. Salko,* 47 N.Y.2d 230, 417 N.Y.S.2d 894, 898, 391 N.E.2d 976 (Ct.App.

---

**4.** Additionally, the Confrontation Clause normally requires that the prosecution demonstrate the unavailability of the witness whose statement it wishes to introduce as hearsay. *See Wright,* 497 U.S. at 814, 110 S.Ct. 3139. The Supreme Court has held, however, that a showing of "unavailability[ ] was not required when the hearsay statement is the out-of-court declaration of a co-conspirator." *Bourjaily,* 483 U.S. at 182, 107 S.Ct. 2775.

1979).[5] This evidence may be admitted only upon a showing that a prima facie case of conspiracy has been established. *Salko,* 417 N.Y.S.2d at 898, 391 N.E.2d 976; *see also People v. Fernandez,* 670 N.Y.S.2d 840, 844 (1st Dep't 1998). Finally, the determination whether a prima facie case of conspiracy has been established must be made without relying upon the declarations sought to be introduced. *Salko,* 417 N.Y.S.2d at 898, 391 N.E.2d 976; *Fernandez,* 670 N.Y.S.2d at 844.

The trial court had sufficient evidence to conclude that a prima facie case of conspiracy to possess and/or sell drugs had been established, and that Eaddy and petitioner were members of that conspiracy. Although the court restricted the evidence before the jury of petitioner's involvement in the Sutton organization, the court was nonetheless presented with information on people running the organization, the structure and roles within the organization, the organization's assets, how much crack it sold, and where it sold it. (Tr. 30–31). Consequently, the court did not err in admitting, as an exception to the hearsay rule, Eaddy's statements made during the course of and in furtherance of the conspiracy.[6]

▮▮▮ Petitioner also challenges the admission of Chapple's hearsay testimony. The testimony in question refers to a statement allegedly made by Sutton that petitioner had "got[ten] points" for murdering Martin. Over defense counsel's objection, the trial court ruled this statement admissible because it provided a context for petitioner's admission, and without it, petitioner's admission made "absolutely no sense." (Tr. 84–86).

The trial court cited no exception to the hearsay rule as its basis for admitting this testimony. It simply remarked that without the statement, petitioner's admission made "absolutely no sense." Chapple's statement was probably also admissible under the co-conspirator exception to the hearsay rule; nevertheless, the court failed to cite the exception in support of its ruling.

▮▮▮ Even assuming, however, that the trial court erred in admitting the statement, the error does not provide a basis for habeas relief. A habeas petition may only be granted if a petitioner establishes that an error had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson,* 507 U.S. 619, 638, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (internal quotations and citations omitted); *see Glenn,* 98 F.3d at 729. In making such a determination, the dispositive factor is the overall strength of the prosecution's case. *See Glenn,* 98 F.3d at 729; *Latine v. Mann,* 25 F.3d 1162, 1167–68 (2d Cir.1994), *cert. denied,* 514 U.S. 1006, 115 S.Ct. 1319, 131 L.Ed.2d 200 (1995).

The trial court's admission of Chapple's hearsay statement, even if erroneous, does not warrant relief under the circumstances. The statement in question was not of sufficient significance to result in a "substantial or injurious effect or influence in determining the jury's verdict." In view of the eye-witness testimony, properly admitted and indisputably compelling, as well as ample other evidence submitted by the prosecution, including petitioner's own incriminating admissions, I conclude that the prosecution's case would not have suffered from exclusion of this statement. Accordingly, its inclusion cannot be regarded as having impacted the jury in any meaningful fashion.

---

5. Similarly, under Federal Rule of Evidence 801(d)(2)(E), a statement is admissible hearsay if the court finds (1) that there was a conspiracy; (2) that its members included the declarant and the party against whom the statement is offered; and (3) that the statement was made both (a) during the course of and (b) in furtherance of the conspiracy. *Glenn v. Bartlett,* 98 F.3d 721, 728 (2d Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1116, 137 L.Ed.2d 317 (1997); *United States v. Rivera,* 22 F.3d 430, 435–36 (2d Cir. 1994). Additionally, a trial court "need only find by a preponderance of the evidence that a con-

spiracy existed." *Glenn,* 98 F.3d at 728. Once the court has found a that a conspiracy exists, such a factual finding may not be disturbed absent clear error. *Id.*

6. The trial court also ruled these statements admissible under the excited utterance exception to the hearsay rule. This ruling was also probably not an abuse of discretion; however, in light of the statements' admissibility under the co-conspirator exception, further analysis is unnecessary.

■ Finally, petitioner complains that the court improperly allowed Rock and Chapple to give their opinions about "the ultimate issue in the case." Petitioner insists that since neither was qualified as an expert, the trial court committed error in admitting their statements into evidence.

This claim is meritless. Neither Rock nor Chapple testified about the ultimate issue in this case. Petitioner mistakenly complains about testimony provided purely as a translation of slang statements the court had previously ruled admissible. For example, Chapple testified that he heard Sutton say that petitioner had "got[ten] points" (Tr. 323); also, that he heard petitioner say that he had "smoked [Martin] once in the head" because Martin "fronted on [them]." (Tr. 397). Upon hearing this testimony, the court asked for a "translation of that [ ] into English" to assist the jury in understanding the witness' testimony. Chapple thus explained that "to smoke" someone is to kill them; "to get points" is to get credit; and "to front on" someone can mean anything from treating someone with disrespect to trying to rob them. (Tr. 324–25).

As the prosecution walked Chapple through explanations of each of these terms, defense counsel made no objection. Notwithstanding petitioner's failure to object, however, the trial court did not err in allowing Chapple to furnish the jury with these translations. The hearsay statements themselves were already admitted. They were, however, of little value to a jury in the form of street slang. Chapple did not need to be qualified as an expert to provide such translations. The trial court did not abuse its discretion in allowing this testimony.

Further, petitioner complains that Rock testified that he heard Eaddy call petitioner "a little faggot" for "being hesitant," and then told the court that he had interpreted that to mean that petitioner "hesitated when he was supposed to have fired." (Tr. 240). When defense counsel objected, the court sustained the objection and instructed the jury to disregard the comment. (Tr. 240–41). Accordingly, for all the reasons stated above, petitioner's third claim for relief is denied.

## E. *The Admissibility Of The Line–Up Photographs*

■ Petitioner asserts as his fourth ground for habeas corpus relief that he was denied due process of law due to the trial court's failure to suppress the line-up photographs. He further claims that the prosecution failed to preserve the photographs for appellate review, and as a result, a "presumption of suggestiveness" must be applied. (Pet. ¶ 12, point IV).

■ Addressing petitioner's second claim first, the mere fact that line-up identification photographs were inadvertently lost after trial does not require that a presumption of suggestiveness be applied. The Supreme Court has determined that the appropriate focus when a prosecution fails to preserve evidence is whether the failure was the result of bad faith. *Arizona v. Youngblood,* 488 U.S. 51, 58, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988). In *Youngblood,* loss of evidentiary material occurred before it was subjected to complete testing and before a complete determination of reliability could be made. Nevertheless, the Court held that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Id.*

Petitioner cites one federal case in support of his claim. The case, however, is in accord with *Youngblood.* In *United States v. Sanchez,* the pretrial photographic spreads were "*deliberately* not retained by the [prosecution], thus making independent judicial review of their contents impossible...." 603 F.2d 381, 384 (2d Cir.1979) (emphasis added). The court was therefore unable to make even a threshold inquiry of whether the pretrial identification was proper. In light of the prosecution's intentional failure to retain evidence, the court assumed that the pretrial identification procedure was impermissibly suggestive. *Id.* at 385.

Petitioner has made no attempt to prove bad faith on the part of the prosecution, and accordingly, none will be inferred. Absent such a showing, petitioner's demand for a presumption of suggestiveness must be denied.

In turning to petitioner's claim that the pretrial identifications should be suppressed, the case at bar is, again, notably distinguishable from the cases reviewed above. In the present case, the line-up photographs were lost *after* trial. More importantly, they were not lost until long after they were determined to be nonsuggestive. Not only was a pretrial hearing conducted, but the photos were also available at trial. Thus, unlike *Youngblood* and *Sanchez,* petitioner suffered no prejudice from the loss of this evidence.

[redacted] Moreover, given petitioner's "full and fair opportunity" to litigate this claim in the trial court, the trial court's ruling and underlying findings are "presumptively correct and can only be overturned by a federal habeas court if the petitioner can demonstrate that they are not 'fairly supported by the record.'" *Sales v. Harris,* 675 F.2d 532, 538 (2d Cir.), *cert. denied,* 459 U.S. 876, 103 S.Ct. 170, 74 L.Ed.2d 140 (1982) (citations omitted). In determining the reliability of the identification, relevant factors include the witness's opportunity to view the criminal at the time of the crime, the degree of attention of the witness at that time, and the level of certainty of the witness. *See Sanchez,* 603 F.2d at 385; *Manson v. Brathwaite,* 432 U.S. 98, 114–16, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977).

[redacted] Here, the record amply reflects the propriety of the court's ruling. The eyewitness had a considerable opportunity to view petitioner at the time of the crime, while she stood inside a phone booth, on a well-lit corner not far from petitioner. Further, as soon as the witness realized that petitioner was carrying a gun, her eyes never wavered from him, as she was, understandably, frightened. Finally, after studying the men in the line-up for about ten seconds, she identified petitioner as the man she saw commit the murder.

The trial court's admission of the pretrial identifications was proper. In view of the strength of the eyewitness identification, the trial court's decision not to suppress this evidence must be upheld. Accordingly, petitioner's fourth claim for relief must be denied.

F. ***Prosecutorial Misconduct***

Petitioner asserts as his fifth and final claim for relief that he was denied a fair trial due to prosecutorial misconduct. Specifically, he claims that during summation, the prosecutor improperly appealed to the passions of the jury, suggested that petitioner was likely to cause harm to an eye-witness who had testified against him, and improperly gave unsworn testimony.

[redacted] The appropriate standard of review on a claim of prosecutorial misconduct in a petition for habeas corpus is whether the prosecutor engaged in "'egregious misconduct ... amount[ing] to a denial of constitutional due process.'" *Floyd v. Meachum,* 907 F.2d 347, 353 (2d Cir.1990) (quoting *Donnelly v. DeChristoforo,* 416 U.S. 637, 647–48, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). A reviewing court must determine whether the prosecutor's remarks were "'so prejudicial that they rendered the trial in question fundamentally unfair.'" *Floyd,* 907 F.2d at 353 (quoting *Garofolo v. Coomb,* 804 F.2d 201, 206 (2d Cir.1986)). To this end, the Second Circuit has established a three-factor test to determine "substantial prejudice" in a prosecutor's summation: (1) the severity of the misconduct; (2) the measures adopted to cure the misconduct; and (3) the certainty of conviction absent the improper statements. *Floyd,* 907 F.2d at 355.

[redacted] In the instant case, remarks made by the prosecutor do not rise to the level of substantial prejudice. Petitioner first claims that the prosecutor appealed to the passions of the jury by playing on their sympathy for the mother of the deceased. He complains that during her summation, the prosecutor twice called the jury's attention to the deceased's mother's last image of her sixteen-year-old son, with his "brains blown out." (Tr. 596). Defense counsel did not object to these statements when they were made; counsel only objected *pro forma* at the end of the prosecutor's summation. The trial court recognized that counsel objected too late; nevertheless, it concluded that the prosecution's statements were "connected to the body of the People's summation," therefore within the bounds of legitimate advocacy.

(Tr. 641–42). Further, the court did instruct the jury that "[i]n deciding the facts, [they] must do so without any reference at all to sympathy, prejudice, or bias of any kind." (Tr. 649).

■ Petitioner next contends that the prosecution improperly suggested that petitioner was likely to cause harm to the eyewitness in retaliation for testifying against him. He argues that the prosecutor's characterization of testimony by the witness as "risk-taking" most likely motivated the jury to convict, simply for the purpose of protecting the witness. (Pet. ¶ 12, point V).

There is no indication from the evidence that the prosecutor intended such an interpretation to be drawn from her comment. The statement was made in response to defense counsel's attempts during his summation to show the jury that Gethers's testimony was unreliable. The prosecutor remarked that given the "traumatic event" Gethers had witnessed, her demeanor in testifying was "nothing short of compelling, at times even risk-taking." (Tr. 610–10A). The comment clearly was intended to argue Gethers's credibility, that given her emotional fragility, she would not have testified had she not believed what she was saying.

■ Finally, petitioner argues that the prosecutor became an unsworn witness when she told the jury that Gethers's gestures were based on strong images. Again, in response to defense counsel's attempts to make the jury question Gethers's reliability, the prosecution tried to show the jury that Gethers's identification, as well as her memory, was sound. She asked the jury to recall Gethers's testimony, her demeanor, and her responses. She then attempted to encourage the jury that Gethers was a thoughtful and reliable witness:

> There was many a time when she was asked a question, and you could see her look up, and she put her hand to her forehead, as if she were recounting the events.... When defendant asked her whether the people in the line-up were standing or seated, she took a moment and then said that the image she had in her mind was of them seated. She did that

consistently throughout her testimony. And that act alone suggests that she is thinking about an event in her mind. She has a strong image of it, and she was making an effort....

(Tr. 612–13).

The prosecutor was thus attempting to convince the jury of Gethers's reliability as a witness. Further, the court instructed the jury that it was its job alone to determine the credibility of the witnesses. (Tr. 652). Therefore, viewing the summation as a whole, the prosecutor's remarks were entirely appropriate. If there was any hint of unfair influence, it was amply cured by the court's instructions. Accordingly, petitioner's fifth claim for relief is denied as well.

### CONCLUSION

For the reasons set forth above, this petition for a writ of habeas corpus is dismissed with prejudice. In addition, as petitioner has not made a substantial showing of the denial of a constitutional right, a certificate of appealability will not issue. *See* 28 U.S.C. § 2253(c), as amended by the AEDPA. *See generally Lozada v. United States,* 107 F.3d 1011, 1017 (2d Cir.1997); *see also Rodriquez v. Scully,* 905 F.2d 24, 24 (2d Cir.1990) (per curiam); *Alexander v. Harris,* 595 F.2d 87, 90–91 (2d Cir.1979). This Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith. *See Coppedge v. United States,* 369 U.S. 438, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962).

SO ORDERED.